CORRIGAN TRANSIT CO. et al. v. SANITARY DIST. OF CHICAGO

(Circuit Court of Appeals, Seventh Circuit. April 11, 1905.)

No. 1,095.

1. NAVIGABLE WATERS—OBSTRUCTIONS TO NAVIGATION—CURRENTS—ALTERATION OF STREAMS—GOVERNMENT PERMIT—CONSTRUCTION.

The government permit to create a current in the Chicago river by connecting a branch thereof with the sanitary canal, providing that the sanitary district shall assume all responsibility for damages to property and navigation by reason of the introduction of such current, constituted a mere contract of indemnity to save the government harmless from liability for such damages, and not an undertaking on the part of the sanitary district to pay damages to third persons for which they would otherwise have no cause of action.

2. SAME—LIBEL—SCOPE.

Where a libel against a Chicago sanitary district to recover damages to shipping by reason of respondent's introduction of a current in the Chicago river was predicated on the introduction of any current therein which would render navigation more difficult and expensive than it pre-

viously was, libelants were not entitled to recover on account of the rate of the current on the date the damages occurred.

**3. SAME.**

Where the Secretary of War authorized the construction of improvements in the Chicago river so as to secure a flowage capacity of 300,000 cubic feet per minute with a velocity of 1¼ miles an hour, but reserving the right at any time, when it became apparent that the current created in the river was an unreasonable obstruction to navigation, to close the connection between the river and the canal of the sanitary district, the grant was not conditioned on the district's keeping the current within the stated velocity.

**4. SAME—UNAMBIGUOUS GRANT—PREAMBLE—REFERENCE.**

The grant of permission to the Sanitary District of Chicago to open the channel constructed by it and cause the water of the Chicago river to flow into the same, subject to conditions specified, being unambiguous, the preamble of the permit could not be resorted to for the purpose of imposing an additional condition requiring the district to keep the current within a stated velocity.

**5. SAME—CONSTRUCTION.**

One of the clauses in the preamble of the grant of permission to the Chicago Sanitary District to connect its canal with the Chicago river recited that the district had constructed an artificial channel between certain termini, and had been previously granted permission by the Secretary of War to make certain improvements in the Chicago river, to correct and regulate the cross-section of the river so as to secure a flowage capacity of 300,000 cubic feet per minute with a velocity of 1¼ miles an hour, it being intended to connect such artificial channel with the river. *Held*, that the sanitary district did not thereby bind itself either to do the work, or guaranty the resulting rate of flowage.

**6. SAME.**

Where libelants sought to recover damages against the Chicago Sanitary District under a permit granted by the Secretary of War, by which such district introduced a current into the Chicago river, an objection that the Secretary of War had no authority to issue such permit, in that Act Cong. March 3, 1899, c. 425, § 10, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3541], authorizing the Secretary of War to issue such permits, was unconstitutional, was repugnant to the scope of the libel.

**7. SAME—NAVIGABLE RIVERS—FEDERAL IMPROVEMENT—EFFECT.**

The federal government's expenditure of money for the improvement of the Chicago river did not evidence an intention on its part to exclude the state of Illinois from all dominion and control over such river, lying wholly within the boundaries of the state.

**8. SAME.**

Congress not having acted under the commerce clause of the Constitution with reference to the regulation or control of the current introduced into the Chicago river, lying wholly within the boundaries of Illinois, by the improvements of the Chicago Sanitary District constructed under consent of the Secretary of War, such regulation was within the jurisdiction of the state as to all the world except future Congresses.

Appeal from the District Court of the United States for the Northern Division of the Northern District of Illinois.

For opinion below, see 125 Fed. 611.

Appellants' libel alleged:

(1) That libelants were interested, some as owners and some in other ways, in the barge Algeria.

(2) That the defendant was a municipal corporation organized under the laws of Illinois.

(3) That prior to October 4, 1900, the defendant had constructed a canal from a point in Chicago to Lockport, Ill., and had connected the South Branch of the

Chicago river with the canal so as to produce a current in the river by the flow of water from Lake Michigan up the river and into the canal.

(4) That for many years prior to the time when the Chicago river and defendant's canal were connected the river was a navigable waterway of the United States, capable of floating vessels of large tonnage bound from the port of Chicago to ports in other states of the United States and in foreign countries, and that there was no appreciable current in the river.

(5) That on numerous occasions prior to October 4, 1900, the barge Algeria had been towed down the South Branch of the Chicago river and out into Lake Michigan, heavily laden with cargoes of grain, and bound for the port of Buffalo, N. Y.

(6) That the barge Algeria was 288 feet in length, 44 in width, and 19 in depth.

(7) That before connecting the canal with the river the defendant, in pursuance of section 10 of the rivers and harbors act of March 3, 1899, c. 425, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3541], applied to the Secretary of War for permission to make the connection; "that such permission was thereupon granted by the Secretary of War upon the express condition that the said sanitary district must and should assume all responsibility for the damage to property and navigation interests by reason of the introduction of a current in said Chicago river, and the said connection was made by the sanitary district under and in pursuance of the terms of said permit so granted by the Secretary of War."

(8) That the barge Algeria was without motive power of her own, and was used by libelants as a tow of the steamer Bulgaria.

(9) That there were numerous drawbridges across the river between Armour's Elevator D and the harbor; that the approaches and center supports lessened the width and capacity of the channel; that thereby the current was increased; and that when a large vessel entered a draw the current was further increased.

(10) That on October 2, 1900, the barge Algeria was towed to Armour's Elevator D, where she took on board a cargo of grain; that on October 4th she was taken in charge by tugs to be towed out of the river to the outer harbor, where her consort was waiting; that the current in the river and through the draws of the bridges was so swift and strong that libelants were compelled to consume more time and to employ more tugs than were necessary before the canal and river were connected; "that said barge would not have encountered any difficulties, and libelants would not have sustained any of the damages hereinafter set forth, had it not been for the introduction of a current into said river by reason of the connecting of the same with said canal in manner aforesaid, and the very strong current which prevailed on said 4th day of October, 1900, and until said barge reached the outer harbor."

(11) That the steamer Bulgaria was waiting at the outer harbor, and libelants were compelled to hold her and her crew during all the time they were engaged in moving the barge.

(12) "That the delays and difficulties encountered in towing the said barge Algeria down the said river were caused solely by the fault of the said sanitary district in permitting and maintaining so strong a current in the said river."

(13) That the barge sustained damages to her timber heads and lines, and libelants were forced to pay for extra services of tugs and suffered loss by the delay, "which damages aggregate $1,081.86, for all of which loss said sanitary district is liable by reason of its permitting and maintaining a current in said Chicago river as aforesaid."

(14) That libelants called on the defendant to settle, and defendant denied liability.

The defendant's answer admitted the truth of the averments in the second, third, fourth, and fourteenth paragraphs of the libel, and alleged ignorance of the matters set forth in the first, fifth, sixth, eighth, and eleventh.

Respecting the seventh, defendant admitted that it had applied to the Secretary of War for permission to turn the waters of the river into the canal, and it exhibited a literal copy of the permit (which is set forth further along in this statement). "And the defendant further alleges that at the time of the

alleged injury in said libel it strictly conformed to the conditions of said permit, and did not violate the same, and denies that this defendant is liable for the impeded progress of libelants in navigating said river, or other damage suffered by libelants resulting from the creation of a current in said Chicago river; and this defendant further alleges that said permit does not bear the construction contended for by said libelants."

Respecting the ninth paragraph of the libel, defendant admitted the condition as to bridges, but averred that it had not created any such obstructions in the channel.

"This defendant is ignorant of the matters alleged in paragraph 10 of said libel, except as to the allegation that a very strong current prevailed on the 4th day of October, 1900, and denies that at said time a strong current prevailed."

Respecting the twelfth paragraph, defendant denied that the difficulties encountered were caused by any fault on its part, and averred that it had a legal right to maintain a current in the river without incurring any liability for the delays and difficulties in navigation.

Concerning the items of damage stated in the thirteenth paragraph, the defendant pleaded ignorance, but denied that it became liable for the damage on account of maintaining a current in the river.

That part of section 10 of the rivers and harbors act of March 3, 1899, which is applicable to the change in the river made by defendant, is set out in the preamble of the permit. The permit is as follows:

"Whereas, by section 10 of an act of Congress approved March 3, 1899, entitled 'An act making appropriations for the construction, repair and preservation of certain public works on rivers, and harbors, and for other purposes,' it is provided that 'it shall not be lawful to alter or modify the course, location, condition or capacity of the channel of any navigable water of the United States unless the work has been recommended by the chief of engineers and authorized by the Secretary of War prior to beginning the same'; and

"Whereas, the Sanitary District of Chicago, a municipal corporation organized under the laws of the state of Illinois, has constructed an artificial channel from Robey street, Chicago, to Lockport, and has been heretofore granted permission by the Secretary of War to make certain improvements in the Chicago river for the purpose of correcting and regulating the cross section of the river so as to secure a flowage capacity of 300,000 cubic feet per minute with a velocity of one and one-quarter miles an hour, it being intended to connect the said artificial channel with the west fork of the South Branch of the Chicago river at Robey street in the said city of Chicago; and

"Whereas, the said Sanitary District of Chicago has now applied to the Secretary of War for permission to divert the waters of the said Chicago river and cause them to flow into the said artificial channel at Robey street as aforesaid; and

"Whereas, the said Sanitary District of Chicago represents that such movable dams and sluicegates as are necessary to at all times secure absolute and complete control of the volume and velocity of flow through the Chicago river have been constructed:

"Now, Therefore, the chief of engineers having consented thereto, this is to certify that the Secretary of War hereby gives permission to the said Sanitary District of Chicago to open the channel constructed and cause the water of Chicago river to flow into the same, subject to the following conditions:

"(1) That it be distinctly understood that it is the intention of the Secretary of War to submit the questions connected with the work of the Sanitary District of Chicago to Congress for consideration and final action, and that this permit shall be subject to such action as may be taken by Congress.

"(2) That if, at any time, it becomes apparent that the current created by such drainage works in the South and Main Branches of the Chicago river, be unreasonably obstructive to navigation or injurious to property, the Secretary of War reserves the right to close said discharge through said channel or to modify it to such extent as may be demanded by navigation and property interests along said Chicago river and its South Branch.

"(3) That the Sanitary District of Chicago must assume all responsibility.

for damages to property and navigation interests by reason of the introduction of a current in Chicago river.

"Witness my hand this 8th day of May, 1899.

    "[Signed]                .           R. A. Alger, Secretary of War.

"John M. Wilson, Brig. Gen'l, Chief of Eng., U. S. A.

    "[Seal.]"                      .

Defendant was created by Illinois for health purposes. It is unnecessary to detail the terms of its charter, for there is neither averment nor proof that it exceeded the powers granted to it by the state. The Chicago river is wholly within the domain of Illinois.

From a decree dismissing the libel this appeal is taken.

Henry D. Goulder and C. W. Greenfield, for appellants.

John M. Harlan and Seymour Jones, for appellee.

Before JENKINS and BAKER, Circuit Judges, and HUMPHREY, District Judge.

BAKER, Circuit Judge (after stating the facts). 1. The libel exhibits this theory of recovery: Defendant, though an instrumentality of the state, could not lawfully alter the course of the river without the consent of the Secretary of War. In obtaining that consent defendant made a promise, which inured to the benefit of libelants, that it would pay all damages occasioned by the change. The change created a current which naturally would (and in libelants' case actually did) require more time and more expense in moving barges than formerly. Therefore defendant must pay. The permit does not contain a promise by defendant to pay damages caused by the change. The third condition, which is relied on, obliges defendant to "assume all responsibility for damages" by reason of the introduction of a current in the river. This was an indemnifying contract, purely between the parties, and not an undertaking by defendant to pay to outsiders damages for which otherwise they would have no cause of action. Defendant's obligation was to pay or fight all claims for damages on account of the current and save the federal government harmless. No elaboration, we believe, can make this conclusion more apparent than does a mere reading of the permit.

2. In argument at the bar libelants urged that defendant should be held liable on account of the rate of the current on October 4, 1900. Some of many reasons for denying the contention are these:

(1) It is outside of the scope of the libel. No averment respecting rate of current was made. Liability was predicated on the introduction of a current (any current) that would render navigation more difficult and expensive than it was previously.

(2) The grant of permission was not conditioned upon defendant's keeping within a stated maximum. The second condition indicates the secretary's intention to observe the effect of defendant's canal operations, and thereafter, if he should deem it necessary in behalf of the public interests committed to his care, to regulate the rate and volume of the current.

(3) In the grant of permission no reference to rate is found. The only reference is in the second clause of the preamble to the grant. But a preamble cannot be resorted to except to help solve an am-

biguity in the body of the grant or enactment. The grant here is unambiguous.

(4) But, if the preamble be taken up, the reference to rate is found to be in a recital of defendant's purpose in asking an earlier grant of permission to correct and regulate the cross-section of the river. Observe that defendant asked leave to do a certain thing to accomplish a certain result. Certainly defendant thereby neither bound itself to do the work, nor guarantied the resulting rate, nor covenanted to remove the abutments and piers of bridges which it had no right to touch.

(5) Defendant's evidence, by engineer's measurements, showed an average velocity of a mile and an eighth an hour, and that on October 4, 1900, no unusual current prevailed. Libelants' witnesses observed the effect of the current upon the movement of the barge, and estimated the velocity at three miles an hour between bridges and four miles in the draws. Even at the places where defendant was at liberty to correct and regulate the cross-section, it was not undertaking to secure a limit of a mile and a quarter an hour when 600 or 700 square feet of the cross-section was taken up by the barge Algeria.

3. Libelants have taken the further position here that the part of section 10 (Act March 3, 1899, c. 425, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3541]), which purports to authorize the Secretary of War to issue permits is unconstitutional as being a delegation of legislative power; that by reason of appropriations made from 1892 on, and by reason of the inhibitory portion of section 10, the federal government had taken exclusive control of the river, and defendant had no power to modify the volume and current; and that the defendant must therefore be made to respond.

(1) This theory of liability is not merely outside of, it is repugnant to, the scope of the libel. Libelants came into court asserting the legality of the permit, and a legal right in themselves to recover on the strength of defendant's assumption of responsibility in the third condition. Even if we perceived any merit in the present contention, we should not be warranted in giving libelants a decree on a matter concerning which there is no issue of fact or of law in the pleadings, thus rewarding them for disavowing their libel.

(2) The federal government's expenditure of money for the improvement of the river did not evidence an intent on its part to exclude the state from all dominion and control over this waterway which lies wholly within the state. Willamette Iron Bridge Co. v. Hatch, 125 U. S. 13, 8 Sup. Ct. 811, 31 L. Ed. 629; Cummings v. Chicago, 188 U. S. 410, 23 Sup. Ct. 472, 47 L. Ed. 525.

(3) A decision of the question whether legislative power was delegated to the secretary (see Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294; Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525) is unnecessary, for the reason that libelants are in error in assuming that section 10, thus emasculated, would remain in force. Congress, acting under the commerce clause, said to Illinois, which would otherwise be sovereign, "You

are not to change the course of the river unless you first obtain the secretary's approval of your plan." The sentence in its entirety—the subjunctive clause as well as the indicative—expressed the will of Congress. The expressed intention was, not to exclude Illinois utterly from exercising her police powers over the river for the welfare of her citizens (and that suggests a nice and delicate question), but to permit the continuation of the exercise upon condition. Now, if the conditional clause is to be deleted, it is not for the courts to construct a new congressional policy out of the fragment. Compare Montgomery v. Portland, 190 U. S. 105, 23 Sup. Ct. 735, 47 L. Ed. 965.

(4) If section 10 stands, libelants' attack fails, because defendant obtained the permit and complied with its conditions. If section 10 falls, what is the result? If a matter affecting commerce is of national scope and susceptible of uniform regulation, the failure of Congress to speak to the subject is deemed equivalent to a declaration that the states shall let the matter alone; but if the matter is local, and concerns the public policy of a state, though it may incidentally affect interstate and foreign commerce, congressional inaction is a recognition that the subject is fitter for local regulation, and is an invitation that the state continue in the unimpeded exercise of its police powers, on the understanding, however, that Congress may thereafter intervene to the extent, at least, of destroying and forbidding whatever unnecessarily embarrasses commerce. Covington Bridge Co. v. Kentucky, 154 U. S. 204, 14 Sup. Ct. 1087, 38 L. Ed. 962; Lake Shore, etc., Ry. Co. v. Ohio, 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702, and cases therein cited. The bridging, dredging, purification of a navigable water-way wholly within a state are matters of the latter class. Escanaba Transp. Co. v. Chicago, 107 U. S. 678, 2 Sup. Ct. 185, 27 L. Ed. 442; Lake Shore, etc., Ry. Co. v. Ohio, 165 U. S. 365, 17 Sup. Ct. 357, 41 L. Ed. 747. With the commerce clause in abeyance, Illinois, as to every being in the world except future Congresses, was absolute sovereign in the premises. The absolute sovereign may change the grade of highways or may vacate them, may alter the courses and currents of rivers or may dam or fill them up, and neither alien nor subject traveler and navigator may complain. No one can claim a vested right to have the United States interfere with Illinois, nor can a cause of action arise from want of interference.

The decree is affirmed.