## GIBBONS v SCHWIND REALTY CO

Ohio•Appeals, 2nd Dist, Montgomery Co

No 1428.   Decided April 14, 1937

Sidney G. Kusworm, Dayton, for appellant.

McMahon, Corwin, Landis & Markham, Dayton, for appellee.

### OPINION

By GEIGER, J.

This case comes before this court on appeal of Pearl Gibbons, as an individual, and as executrix of the estate of James F. Gibbons, deceased, on questions of law and involves the construction of certain contracts entered into between the plaintiff and her decedent, and the defendant.

There are certain stipulations as to facts which are brought into the record by a proper memorandum.

The plaintiff below bases her action upon certain facts which may be briefly summarized as follows:

In 1926 James F. Gibbons entered into a lease with the defendant Realty Company, whereby the company leased to the said James F. Gibbons certain premises, for a term of twenty years, from November 1, 1926. On April 22, 1930 Gibbons, having incurred a forfeiture of the lease, and both parties thereto desiring to protect themselves from the loss under said lease, entered into a certain agreement terminating the lease, by the terms of which the plaintiff's decedent was to deliver to the defendant his note for $25,000.00, payable five years after date, with certain collateral

security; the Realty Company was to use its best efforts to produce as much revenue as possible from reletting or use of the building, in order to minimize the loss of each of the parties; that at the end of five years, if no loss had been sustained, the Realty Company would cancel and surrender the note; that if a loss of $25,000.00 or more were sustained the company might exercise its rights as the holder of the secured note, and the security deposited; that certain agreements were to be made as to computing the expense of operation of the building by the Realty Company.

It is alleged that the note was executed and the collateral deposited, and all the conditions of the contract carried out by the plaintiff; that the five year period has expired; that in the operation of said Realty Company there was a profit during the five year period of $12,019.88. Plaintiff demanded that the company cancel the note and return the collateral. The Realty Company failed and refused to cancel said note in accordance with the agreement, and plaintiff asks the surrender of the security held by the Depository National Bank. It is alleged that unless restrained by the order of the court, the bank will deliver said collateral to defendant.

Plaintiff prays that the promissory note be cancelled; that the collateral security be returned to her.

To this petition the defendant Realty Company filed an answer and cross-petition, admitting certain allegations and denying all others, and by way of cross-petition alleges that it is the holder of the promissory note executed by James F. Gibbons, together with certain collaterals enumerated; that there is $1901.30 held by the bank and that there is due to the defendant from the plaintiff executrix the sum of $25,000.00, with interest. The defendant prays that the security held by the bank be ordered sold, and the proceeds thereof, together with the cash held, be applied to the payment of the note, and for judgment for the balance that might be due.

Pearl Gibbons, as an individual and as executrix, by reply, denies all the allegations in the answer and cross-petition of the Realty Company, inconsistent with the allegations of the petition.

The issues were tried and the court found in favor of defendant and against the plaintiff, and held that the Realty Company is entitled to recover judgment against the plaintiff as executrix, on its cross-petition, $25,000.00, and to have the collateral held

by the bank applied to payment of its judgment.

Motion for a new trial was filed and overruled, and final judgment entered on July 11, 1936, wherein it was ordered that the Realty Company recover from plaintiff the sum of $25,000.00; and that the bank pay to the defendant the balance now in its hands, and that unless the executrix shall, within three days, pay to the clerk the balance found due, an order of sale issue to the sheriff, directing him to sell the collateral, apply the proceeds to the debt.

Pearl Gibbons, as an individual, filed notice of appeal.

The matter is before the court to determine whether or not there is error in the orders made by the court below.

## THE LAW

Before entering upon an examination of the contract involved in this action, it is well that we refresh our memory on certain general principles controlling the interpretation of contracts. Of these general principles we will set forth only vital elements not endeavoring to go into detail or to cite many authorities. Where there may be rules specially pertinent in the examination of this case, we may set forth principles of law at large.

In construing certain instruments the primary rule is that the intent or purpose shall be chiefly gathered from the language employed by the parties, and where there is no doubt as to the effect to be given to the language used, there is no room for, nor right of, construction.

Courts cannot make contracts for others, and a party to a written contract is bound only by the words of the contract, and the court may not read language or terms into a contract. Contracts must receive a reasonable interpretation in accord with the intent of the parties, if it can be ascertained from their language. Where the meaning is doubtful so that the contract is susceptible of two constructions, the interpretation which makes a rational and probable agreement must be preferred.

In harmonizing apparently conflicting clauses of a contract, they must be construed to give effect to the intention of the parties as gathered from the whole instrument; and where the object to be accomplish-

ed is declared in the instrument. the clause which contributes most essentially to that object will control.

Extrinsic parol evidence is admissible under proper circumstances to give effect to a written instrument, by proving the circumstances under which it ▮▮▮▮▮▮ ▮ was made, thereby enabling the court to put themselves in the place of the parties, with all the information possessed by them, the better to understand the terms employed in the contract. and to arrive at the intention of the parties.

In construing a contract the words employed by the parties should be construed in the light afforded by the circumstances surrounding them at the time it was made.

The intention of the parties must be ascertained by the ordinary rules of construction. considering not only the language of the contract, but also in cases of uncertainty the construction placed upon the contract by the parties themselves.

There should be given to each word and expression that plain and obvious meaning which contracts and the ▮▮▮▮▮▮ ▮ whole instrument require to make each part consistent with the whole. and carry into effect the object of the parties.

Gas Company v Akron, 81 Oh St 33; The Mills Co. v Hubarty, 84 Oh St 81; Hildebrand v Fogle, 20 O. 147; Iron Co. v Keynes, 56 Oh St 501; Huntington Co. v Lumber Co., 109 Oh St 488; Bank v Cole, 83 Oh St 50; Bank v Laidlaw, 86 Oh St 91; Railroad Co. v Railway Co., 44 Oh St 287; 9 O. Jur. §183, p. 408.

As possibly more particularly applicable to the case at bar, it is a principle of interpretation that:

"Where words used in a contract are susceptible of more than one meaning, and the signatories to the contract have by acts done in ▮▮▮▮▮▮ ▮ tract have by acts done in carrying out the terms thereof placed their own interpretation upon the meaning of the words, courts will adopt the interpretation which the signatories to the contract have themselves made."

Courtright v Scrimger et, 110 Oh St 547.

Huntington Co. v Lumber Co., supra:
"Several writings although executed at different times may be construed together for the purpose of ascertaining the terms of a contract." "* * * where two or more instruments are contemporaneously and mutually prepared and executed by two parties, pursuant to a common or mutual intent and design, * * * equity will impute and infer that the parties thus expressing their purposes mutually intended that the two instruments were to operate and be carried out concurrently, and that the instruments be regarded as one transaction."

Coal Co. v Coal Co., 26 O.N.P. (N.S.), 117-p. 120.
"Although a binding construction of a contract can be made only by the court or jury, and a practical construction thereof made by the parties has no binding effect, nevertheless, when the contract is ambiguous it may be considered by the court as an aid to its construction of the contract."

9 O. Jur. §196. p. 424.
"It is an established doctrine of the law that where private citizens have made a contract and their conduct ▮▮▮▮▮▮ ▮ under that contract has given construction to its terms. the court in construing the same, will give great weight to the construction given it by the parties themselves, especially if the language is in any way ambiguous."

State ex v Miller, 87 Oh St 12, p. 33.

In Braddock v Boner, 9 O.C.C.R. (N.S.) at page 11, it is said:
"Courts will always look to the interpretation placed upon a contract by the parties themselves in giving it effect, and in construing it according to the meaning and intents of the parties thereto."

"The practical construction placed upon a contract in the performance thereof by the parties who made it should in case of doubt have great weight in its construction by courts."

Cincinnati v Gas Company, 53 Oh St 278.

## FACTS

Under the guidance of the principles above recited we will proceed to examine facts involved in this controversy. The discussion will necessarily be rather lengthy, as there are a number of important questions involved, each of which presents some difficulties. In order that we may put ourselves in the position of the parties, when they made the contract under investigation, in 1930. it may be necessary to examine all the documents and accounts stipulated into the record. This may be done as to the several contracts made simultaneously

with the agreement, Exhibit "B", either as throwing light upon the position occupied by the signatories at the time the contract was made, or as documents which should be considered as part of the agreement, and which together with the agreement should be regarded as one transaction.

The original lease made in 1926, may be examined to throw such light as it may upon the intention of the parties when they made the agreement in 1930.

## THE LEASE:

The Realty Company leased the premises described to James F. Gibbons, under date of August 1, 1926. It was made subject to leases held on portions of the premises, and provided for an annual rental of $50,000.00. The lessee, in addition to the rentals, was to pay all taxes, assessments and other public charges assessed upon said premises, throughout the term of the lease.

The lessor was not to commit or suffer any waste, but covenanted to keep the premises in as good condition as they now are or may be put, reasonable use and ordinary wear and tear thereof excepted; and at his own expense throughout the term of the lease insure the premises against loss by fire and public liability.

Provision is made for the removal of the bridge which has been constructed connecting the present Gibbons Hotel Building with the premises leased.

Reservation is made to the lessor of a valid and first lien upon the leased premises, and the leasehold estate created, and upon all the furnishings and equipment in said building.

If at any time there be a default on lessee's part in the payment of the rent, taxes, etc., it shall be lawful for the lessor to enter upon the premises and repossess the same, and thereupon the lease and everything contained therein on the lessor's behalf shall cease and be utterly void, and the lessor, upon so taking possession of said premises, may bring suit for and collect rents, taxes and assessments which shall have accrued up to the time of such entry. And all the improvements made on said premises shall be forfeited.

An extension of ten years is provided for with a right to purchase at the expiration of the twenty years for $750,000.00 in cash.

## THE AGREEMENT.

The agreement which is in controversy was dated April 22, 1930, and is marked "Exhibit B". It is recited in the preamble that Gibbons and the company had entered into a lease for a term of twenty years; the said Gibbons has incurred a forfeiture of the lease, has informed the company that he is unable to cure his existing defaults, and will be unable hereafter to perform the terms and conditions of said lease, on his part to be performed; and the Realty Company is about to exercise its right of re-entry.

It is recited:

"The Realty Company desires to protect itself and the said Gibbons from loss, so far as possible, and will endeavor to make such use of said building as will in its judgment produce the most revenue, and so minimize the damages that will be sustained by the Realty Company by reason of the failure of the said Gibbons to carry out the terms of the lease. The parties agree, however, that the disruption of the business formerly carried on in said building, the necessity of certain remodeling, and temporary idleness of at least a portion of said building will cause the Realty Company to suffer an immediate loss amounting to a large sum of money, and that the uncertainty of future revenue from said building during the remainder of the twenty year period subjects the Realty Company to the risk of further heavy losses."

"In consideration of the premises and for the purpose of working out a solution of the situation for the best interests of both parties, it is agreed by and between the parties as follows:"

Gibbons agrees that he will forthwith execute to the company a valid bill of sale conveying to the company the furnishings and equipment of said building, including all property belonging to Gibbons or used by him in the operation of the building as a hotel, on which property a lien has been reserved by the Realty Company under the terms of the lease; it is agreed that the value of said furnishings is $30,000.00.

"and credit for that amount is hereby given to the said James F. Gibbons, to be applied against the loss and expense which will be incurred by the Realty Company in remodeling said building, and in temporary loss of income, if any, while such remodeling operations are being carried on; together with all consequential damages, if any, which may be incurred by the Realty Company in connection with or as a result of such operations."

The Realty Company shall keep an accurate record of its cost of remodeling, and its loss of income incurred by reason of the abandonment of said lease between the date hereof and the time when said building shall be ready for use for whatever purpose the Realty Company decides to put the same in its endeavor to make said building as productive as possible and minimize the loss to both parties as aforesaid. If such costs, losses, and damages exceed the sum of $30,000.00, Gibbons shall not be required to account for the excess.

"If it be less than $30,000.00, the difference shall be pro rated over the remaining period of the twenty year lease aforesaid, and the sum of such yearly credits for the first five years after the date of this contract shall be applied as a credit on the promissory note of James F. Gibbons, hereinafter provided for in Paragraph 5 hereof, and the yearly credits for the remainder of the period of the lease shall be applied each year to reduce the liability of James F. Gibbons for subsequent losses of the Realty Company, if any, in the operation of the building as provided in Paragraph 5." "Under no circumstances shall the Realty Company by reason of any such credits be required to make any refund or payment of any kind to the said Gibbons in cash or in any other manner except by applying such credits, if any, to reduce the liability of the said Gibbons to the Realty Company for loss of income from said building, if any, in the manner herein provided."

Contemporaneously with the execution of the agreement, there is to be paid to the company $13,432.73, to cover the taxes and assessments, and unpaid rent which had accrued.

Under Paragraph 4, Gibbons shall upon the execution of the agreement deliver to the company his promissory note for $25,-000.00, payable five years after date.

"to protect the Realty Company against further loss by reason of the termination of said lease."

Gibbons and his wife, Pearl, are to assign certain collateral as security for the note.

Paragraph 5 provides:

"The Realty Company agrees to use its best efforts to produce as much revenue as possible from the reletting or use of said building, in order to minimize its own loss and the loss of the said James F. Gibbons, and agrees that at the end of a period of five (5) years from this date, upon the maturity of said promissory note, if no loss has been sustained, the Realty Company will cancel and surrender said note and assert no claim thereon. If a loss of $25,000.00 or more has been sustained, the Realty Company may exercise its full legal rights as the holder of said secured note, but shall waive any and all claim for damages in excess of $25,000.00, theretofore or thereafter sustained."

If the loss for the five year period is less than $25,000.00, the company may enforce payment of the entire amount and apply such part thereof as may be necessary to off-set its loss "and hold the balance of the proceeds as security against further loss."

Under the provisions of Paragraph 6, it is agreed that in computing the cost of operating said building, for the purpose of carrying out the provisions of Paragraph 5, the company shall charge no depreciation on the building, and shall not depreciate the furniture at any higher rate than the said Gibbons has depreciated it in the past; that the salaries of the officers of the company, or of any subsidiary which may be formed for the purpose of taking over or operating said building shall not be charged against such operation, in computing profit and loss. It is provided that the company shall render to Gibbons a monthly operating statement showing the revenue from the building, cost of maintenance and operation, and net income.

## RELEASE

"Exhibit C" dated the 22nd day of April, 1930, can probably be well considered as a part of the contract. It certainly may be considered as throwing light upon the intention of the parties. It provides that the company in consideration of the agreement, and the execution by Gibbons of the bill of sale and the promissory note and assignment provided in said agreement, does

"hereby for itself, its successors and assigns, acknowledge and declare that all debts, claims, demands, damages, actions and causes of action whatsoever, arising out of or in any manner connected with the obligations of the said James F. Gibbons to The Schwind Realty Company un-

der the terms of a certain lease executed as of August 1, 1926, by and between said The Schwind Realty Company as lessor and the said James F. Gibbons as lessee, are merged in said agreement of even date herewith; and said The Schwind Realty Company does hereby release and forever discharge said James F. Gibbons, his executors, administrators and assigns, from all obligations under said lease, and in lieu thereof shall look for its complete satisfaction to the obligations of the said James F. Gibbons and Pearl Gibbons, his wife, as set forth in said agreement of even date."

## ASSIGNMENT.

"Exhibit D", dated the same day, provides that whereas Pearl Gibbons is the owner of Certificate No. 86, etc., and the said Pearl Gibbons has heretofore pledged said stock to the Third National Bank, to secure the payment of a certain promissory note made by her husband and herself, for $48,000.00, and whereas, both desire to assign all their right to said shares to the company, pursuant to the agreement of even date, assignors, pursuant to the provisions of said agreement jointly assign to the company all their interest in said collaterals, which are accepted by the assignee in accordance with the provisions of the contract.

## AGREEMENT "EXHIBIT E"

This agreement is dated April 22, 1930, and was made by the Bank, party of the first part, the Realty Company, party of the second part, and Gibbons and his wife, parties of the third part, and recites the indebtedness of the third parties to the first party, in the sum of $48,000.00; and the fact that Gibbons has entered into an agreement with the company, whereby the company has an interest in the collateral; it is agreed that the bank has the first lien upon the collaterals and the Realty Company has the next lien "up to the amount which may be due to the second party," under and by virtue of said agreement between the company and Gibbons.

Paragraph 3 provides that in the event that the indebtedness of Gibbons to the Bank is paid in full, and so long as there is any obligation of Gibbons to the Realty Company under the terms of the agreement, all of the collaterals shall be held by the Bank "to secure a performance of the obligations of James F. Gibbons under said agreement."

Paragraph 4 provides that in the event the amounts due or to become due by vir-

tue of the indebtedness of Gibbons to the Bank, and to the company are fully paid, then the overplus is to ,be paid to Pearl Gibbons.

## INCOME—HOTEL MORAINE.

Under the agreement the company was to keep an accurate record of its cost of remodeling, and it is further provided that the company shall render to Gibbons a monthly operating statement of the revenue of the building, cost of maintenance and operation and net income. The agreement provides for a monthly operating statement but this apparently was not made monthly. The first analysis of income was from May 10, 1930, to August 31, 1930; the second from September 1, 1930 to December 31, 1930, and thereafter they were rendered for an entire year with the exception of the last accounting, which was from January 1, 1935, to April 22, 1935, which latter date was the termination of the five year agreement.

These reports so submitted have interesting significance, from which we draw some inferences.

The income reported seems largely derived from the rental of rooms, with small incidental amounts, and the larger items of "store room rentals," which item appears throughout the entire period, in amounts varying from $11,000.00, for the entire year of 1931. to the minimum item of $52.67, for the year ending December 31, 1933.

These accounts show, under the caption "Cost of Operation," items which are appropriate to the operation of a hotel. except there does not appear any items covering the cost of food or its preparation and service or the income therefrom.

In the account there are frequent items which would be appropriate for the maintenance in proper condition of both the hotel and of the furnishings. In each one there is charged "depreciation" of the building, as an operating cost, and also "depreciation" of the furnishings and fixtures, and other items appropriate to the operation of a hotel. There is also charged conservancy and local taxes in quite substantial amounts, together with insurance and bad accounts charged off. At the end of the accounts they are credited with the amount before charged for "depreciation" of building, so as to leave as its final item "profit before deducting depreciation of building." It is not necessary to detail these accounts as to the profit or loss exhibited by each.

Sufficient it is to say that the total of five accounts shows a profit of $18,883.56, and a total of two discloses a loss of $6,881.76, or a net profit of $12,001.80, before taking "depreciation."

Many other inferences may be drawn from these accounts, but of that later.

## INTERPRETATION OF THE AGREEMENT

We will assume without further discussion that there are some uncertainties and ambiguities in connection with this agreement, which justify the court in considering the circumstances of the parties in relation to each other at the time the agreement was made, not, of course, to in any way contradict or vary the terms of the writing, but to enable the court to put itself in the place of the parties, the better to understand the terms employed in the writing, and to arrive at the mutual intention of the parties.

We might briefly summarize it as follows:

In 1926, the parties entered into a lease, whereby the lessee bound himself to pay to the lessor an annual rental of $50,000.00 and further to bear the burden of the taxes of all kinds and insurance. The lessee prepared the building to be operated in conjunction with his nearby hotel, and furnished it to such an extent that the agreed price of the furnishings in 1930 was $30,000.00 At that time, the condition of the country was such that high rentals and high prices were in vogue, and it did appear that the lessee was an experienced hotel man, with a hotel of his own closely adjacent to this property.

In 1930, the parties came together and the lessee admitted that he was in default. He had not paid the taxes and probably some of the rent was due, and he admitted that he could not discharge his obligation under the lease. It appeared also whatever may have been his condition of health in 1926, that in 1930, he was a sick man, possibly advanced in the illness that ultimately, and at a no distant time from 1930, resulted in his death. The fact that he was ill in 1930, while admitted in the briefs can be inferred from the fact that in all agreements signed by himself and wife, in 1930, Mr. Gibbons signed his name by mark. Of course, this may have been due to a temporary or local injury, but owing to his early demise, we may assume that he was a sick man. The record does not disclose this in any direct way.

By 1930 there were signals of coming financial trouble, which we now know

should have been heeded, but which were then regarded as a temporary matter

The circumstances then surrounding the parties could be summarized; the company owned a building, then appropriately arranged and furnished as a hotel, leased to a man who so far as the leased building was concerned was engaged in a losing venture, and was failing physically. He was indebted to the company for over $13,-000.00 for unpaid taxes and rent, and indebted to the bank for $48,000.00. He owned $30,000.00 worth of furnishings, upon which the company held a lien, for the unpaid taxes and rent. The wife of the lessee was the owner of chattel property pledged to the bank for the indebtedness to the bank, and was also no doubt interested in the life insurance policy, also pledged to the bank.

The lessee had stated that he could not carry out the provisions of his lease. The company had no prospective tenant, and did not itself wish to engage in hotel business.

The contract recited "And the company is about to exercise its right of reentry." What was that right of reentry? It was to enter upon the premises, and to repossess and enjoy the same and "thereupon this lease and everything herein contained on the lessor's behalf to be done and performed, shall cease, determine, and be utterly void." And the lessor upon taking possession of said premises may bring suit for and collect all rents, taxes, assessments, payments or other charges which shall have accrued up to the time of such entry. In other words, if the default of the lessee continued, and the lessor continued to pursue its determination to repossess itself of the property, it could collect the rents that were due up to the time of reentry, but not beyond. It could not take possession of the building under the terms of the lease and proceed to collect rents beyond the time of its reentry.

If it was forced to a reentry, the lessee owed it over $13,000.00, which it might or might not be able to collect. It had a lien upon the furnishings for this amount, but, of course knew that the hotel furnishings in a building that was not to be used for a hotel, were of little value.

The lessor was confronted with the problem of making the most out of a failing enterprise, and saving itself from additional loss, so far as possible. The lessee confessed a forfeiture; and that he was unable to cure his existing defaults.

On the part of the lessee, he was in a

position of an experienced hotel man, in declining health, with a debt to the bank of $48,000.00, for which he had pledged his life insurance, and a debt to his landlord of $13,000.00, for which his hotel furnishings were pledged. His wife owned the collateral which she had pledged for his debt to the bank, and was willing to pledge it, for his benefit, under the terms of the agreement.

It was not a rosy picture for either side, and each was seeking the best way out. Under these conditions, the parties entered into a contract which has ambiguous phrases, which must be interpreted to carry out their intent at the time they signed.

A large amount of the controversy centers around paragraph 5. The company among other things, agreed to use its best efforts to produce as much revenue as possible from the reletting or use of said building.

In order to minimize its own loss and the loss of Gibbons the company, under these terms, had the right either to relet the building as a hotel, or for any other purpose, or to use it itself, but the purpose in either event was to minimize its own loss and the loss to Gibbons; its own major loss, of course, was the loss of the rent; it was almost certain to lose a part or all of it, because at that time buildings were not readily rented. It determined to use the building, and run the hotel itself; its hope then was by operating it as a hotel to produce enough income to lessen the loss of the rental of $50,000.00, agreed to be paid by Gibbons, which would have been lost in the event it reentered the property under the terms of the lease.

Paragraph 5 also provides that upon maturity of the promissory note, if no loss has been sustained the note be cancelled. If the loss of $25,000.00 or more has been sustained, the company would exercise its right as to the note, but would waive all claim in excess of $25,000.00, theretofore or thereafter sustained. If the loss for the five year period is less than $25,000.00, the company could enforce the payment of the note and apply such part thereof as may be necessary to off-set its loss "and hold the balance of the proceeds as security against further loss."

Under paragraph 4, the note was given to protect the company against further loss, by reason of the termination of lease.

One of the ambiguities touching this agreement is the provision that if the loss is less than $25,000.00, the company may enforce payment of the note and apply such part thereof as may be necessary to off-set its loss and hold the balance of the proceeds as security against further loss.

We think that as an indication that there is a continuing obligation upon the part of the plaintiff to pay losses over a period concurrent with the term of the lease, it is not of great weight in overcoming the effect of other provisions of the contract to the contrary.

We have not been favored with the entire opinion of the trial court below, but are advised by counsels' brief that the judge definitely held that the lease was cancelled.

Paragraph one of the agreement has given us some concern. It provides that Gibbons shall deliver to the Realty Company personal property of the agreed value of $30,000.00, and credit for that amount is given to Gibbons to be applied against loss and expense in remodeling said building, and in temporary loss of income, while such remodeling is being carried on

The company is to keep an accurate account of this loss between the date of the agreement and the time when the building shall be ready for use for whatever purpose the company may decide to use the same, in its endeavor to make said building as productive as possible, and minimize the loss to both parties.

If the cost of remodeling is over $30,-000.00, Gibbons shall not be required to account for the excess, but if it is less than $30 000.00, the difference shall be pro rated over the remaining period of the twenty year lease and the yearly credits for the remainder of the lease shall be applied each year to reduce the liability of Gibbons for subsequent losses to the Realty Company in the operation of the building. Under no circumstances shall the company be required to make any refund except by applying such credits to reduce the liability of Gibbons for the loss of income from said building, in the manner herein provided.

It is agreed by paragraph 8 of the stipulations, that the remodeling of the building by the company referred to in paragraph 8 of Exhibit B, was completed on or about August 31, 1930, at a cost of $24,-622.23. This would leave a balance of about $5,500.00 of the $30,000.00 to be applied under the terms of the contract, but no part of it would be refunded in cash. The only trouble we have in considering this paragraph, is that it seems to extend the liability beyond the five year period for the remainder of the period of the lease, to

reduce the liability or subsequent losses to the Realty Company in the operation of the building.

We do not regard the rather obscure and confusing provisions about applying such loss over a period of years, subsequent to the cancellation of the lease, as overweighing other more appropriate terms as to the meaning of the contract.

Without going further into detail as to the agreement, we point out the provision of the release (Exhibit C). It was there very clearly stated that the company releases and discharges Gibbons from all obligation under the lease, and in lieu thereof shall look for its complete satisfaction to the obligations of Gibbons under the agreement. The lease was out of the picture upon the signing of the agreement on April 22, 1930, and had no place for further consideration, except as just above pointed out.

It is not necessary to comment further upon the assignment "Exhibit D", and the agreement, "Exhibit E", except to say that their contents may be read either as part of the agreement of April 22, 1930, or as indicating the circumstances under which it was written as may be most appropriate.

As to "Exhibit F", we first note that the agreement, paragraph 10, stated that a similar operating statement covering the period from September 1, 1930, to April 22, 1935, is attached as "Exhibit G." We find no such exhibit attached, or no such statement.

Returning to a further examination of "Exhibit F," it must be remembered that the income statements were made in compliance with the provisions of the agreement that the company was to render monthly operating statements showing a gross revenue from the building, cost of maintenance, and operation, **and net income.** Over a period of five years these statements were made, confined to income from the building and cost of operation appropriate to the operation of a hotel, together with depreciation of personal property, and the payment of taxes and insurance. In not a single one of these statements is there any reference made to the now asserted claim that a part of the cost of operating the hotel was rent provided for by the lease, or rent of any kind. The Realty Company simply took the property, and in order to curtail its loss sought to operate the hotel, without charging against such operation either the depreciation or rental.

If there is any ambiguity we have a right to look to the interpretation given it by the parties to the contract. It is now asserted that the company should have attached to its yearly operating sheet this item: "To rental of building—$50,000.00." We can imagine how startled Gibbons and his wife would have been to see such a charge, and how they would have been completely at a loss to know how their guaranty of $25,000.00, against the loss due to operations of the building, was to be spread over an assured loss of $50,000.00 a year for rent.

A pertinent inquiry is made by counsel for defendant as to how there could be any gauge of the company's loss had the company relet the building instead of operating it themselves. In the first place, they did not do it, so that we need not concern ourselves about that, except so far as it may furnish light upon the meaning of the parties when they signed the contract. We are quite sure that had they, as a matter of fact, let the building to some other tenant for a rental less than $50,000.00, that they could not have charged against Gibbons' $25,000.00 note or against Gibbons himself the difference between the sum they received and $50,000.00. The $50,000.00 was completely out of the picture.

The company chose to operate its own property and all the accounts submitted to Gibbons over a period of five years failed to disclose any charge for rent. Having not charged that during the period of five years, and having thus shown that its understanding was that it should not be charged, they cannot come in now, and, "upon advice of counsel," assert that it, during this whole period, had a mental reservation of a rent charge of $50,000.00 a year.

Counsel for appellee makes some suggestions that if this interpretation is not put upon the contract, it convicts the Realty Company of practicing philanthrophy.

What about the other side of the case, so far as the two Gibbons are concerned? In 1930 Gibbons, in his then condition, informed the company that he was unable to cure his existing defaults, and would be unable hereafter to perform the terms and conditions of the lease. It further appears "and the Realty Company is about to exercise its rights of reentry." As they then stood, if the Realty Company exercised its rights of reentry they could only collect from Gibbons the rent and un-

·paid taxes due until the time of the re-entry, after which they would have the building on their hands with no guaranty of any kind as to any loss that they may sustain. Gibbons would have $13,000.00 in his pocket The company would have the right to seize whatever value there remained in the furniture, after the application of $24,000.00 of its agreed value to the cost of remodeling. Mrs. Gibbons would have had her securities free from the lien of $25,000.00 pledge.

Looking at it from the side of Gibbons, the ordinary man would have been tempted to say to the Realty Company: I have tried to make enough money to pay you your $50,000.00 a year, I cannot do it, you can either sue me each year, for the $50,-000.00, or take back your property, and let me pay you what I owe you to date. That would have relieved him. Instead of that, he said to the company: You embark for five years upon the hotel business, and I will guarantee to the extent of $25.000.00 that you don't lose on this operation. The hotel company did not lose on that which was certainly the limit of the guaranty contemplated by the agreement and by all papers in connection therewith, and shown to be such by the five year accounting of the company. .

We have carefully gone over the brief of appellee. There is much in it that is well stated, but much in it with which we cannot agree.

For instance, on page 5, counsel assert in making this calculation, the appellant ignored the fact that the company lost $50,000.00, which it would have received as rent if the lease had been performed. That is very good argument, if the lease had been in force, but it is very bad argument, in the face of the fact that the lessee had defaulted and had stated that he could not thereafter perform the terms of the lease and that the lease was, as a matter of fact, terminated.

It would be a profitless undertaking to answer in detail all the contentions of counsel for appellee; but we are quite certain of this, that Gibbons never had in mind and was not required to have in mind, and no other party had in mind that the $25,000.00 was a guaranty that during the course of five years the company would not only make its operating expenses, but would make enough to pay itself $50,000.00 rent. If that were the contract, Gibbons might just as well have handed over the $25,000.00 in the beginning, because he would not have the remotest chance of get-

ting any of it back under the interpretation given to the contract by the appellee.

We feel that Mrs. Gibbons, as executrix, or as an individual, is entitled to whatever the several interests may be in the collateral securing the payment of the $25,-000.00 note, and is entitled to have the note cancelled.

For failure to hold this the court below erred, and the judgment of that court is reversed.

Judgment for plaintiff as prayed for; prayer of the cross-petition denied and cross-petition dismissed.

BARNES, PJ, and HORNBECK, J, concur.