REPUBLIC-ODIN APPLIANCE CORPORATION, PLAINTIFF, *v.*
CONSUMERS PLUMBING & HEATING SUPPLY CO., INC., DEFENDANT.

Common Pleas Court, Cuyahoga County.

No. 737387. Decided May 3, 1963.

514

*Mr. Albert P. Hadley, Messrs. Hadley & Auble,* and *Mr. Walter A. Dart, Jr.,* for plaintiff.
*Mr. Oscar J. Green,* for defendant.

(HODDINOTT, J., sitting by assignment from Monroe County.)

HODDINOTT, J. Plaintiff is a manufacturer of home water heaters. For about seven years, it did a large-scale business with defendant, which sold at wholesale to building contractors and at retail to home owners. This dual mode of business apparently offended the notions of orderly marketing procedure held by plaintiff and plaintiff's other customers who competed with defendant, and gave rise to friction.

Defendant's dominating figure is Richard Friedman, its president. He is a skillful bargainer in a business which is highly competitive, and adept at obtaining substantial price discounts in his purchases. He is proud of taking cash discounts for prompt payment of all his bills; over the years, however, there were frequent disputes about items on the bills rendered by plaintiff. Defendant was a good, but hardly a favorite, customer of plaintiff.

In the latter part of November, 1958, plaintiff had about a dozen pending orders from defendant. Delivery was to be made in installments when requested. If payment for an installment was made by the 10th of the month following delivery, then a cash discount was allowed. Defendant contended it was entitled to take the discount on deliveries after the 25th of the month if paid before the 10th of the second following month, by reason of custom of the trade and previous dealings with plaintiff. Plaintiff disputed this position.

The sequence of events upon which this case turns started, November 28, 1958, when plaintiff's credit manager wrote to Friedman: "... in view of the past due invoices and the various

unauthorized deductions which you have made, I feel that we must deny open account terms at the present time." Friedman and plaintiff's president, Milton Stevens, had some telephone conversations and, five days later, on December 3rd, the shipment which is plaintiff's claim No. 14 (Plaintiff's Exhibit G) was shipped on open account, as had been customary between the parties.

Three days later, on December 6, Friedman and Stevens had another telephone conversation during which Friedman made a series of extraordinary demands. They were reduced to writing in Friedman's letter of December 22 to plaintiff (Defendant's Exhibit 4) as follows:

"Mr. Stevens was advised that we would continue to do business with the Republic Heater Corporation only conditioned on the following terms.

"(A) That the very poor competitive conditions created by Republic Water Heater through the sale of Republic products to the Gafney-Bierman Company would be stopped, that they would no longer have available to them the trade name "Republic," but however Republic could continue to sell them Water Heaters under any other trade name. During this phase of the conversation Mr. Stevens advised such action would take thirty (30) days, and in the same sentence sixty days, and finally six months. Mr. Stevens was advised that we did not wish to start a similar situation to that which we had, based on loose statements, and that he should state some specific time limit and then stick to this.

"(B) That Consumers Plumbing and Heating Supply Company would hold up the monetary difference between the new cost of the 1300 approximate Water Heaters on order with Republic Heater Company, at the price those Water Heaters were ordered and at the price those Water Heaters would cost as a result of price increases which went into effect on November 1st. Mr. Stevens talked "have trust" and was advised that his company had not shown the proper attitude necessary to warrant them.

"(C) That any future Cleveland additional distribution would be okayed by Mr. Friedman of Consumers Plumbing and Heating Supply Company, before such distribution was com-

menced, to prevent a reoccurrence of a similar situation to that prevailing.

"(D) That Republic Water Heater Company was to refund to Consumers Plumbing and Heating Supply company the cash difference for two truck loads of Water Heaters purchased, from other sources, at the new higher price, and above that price for which the Water Heaters should have been shipped from Republic Water Heater Company. These heaters were necessary because of the refusal of the Republic Water Heater Company to make shipment to Consumers Plumbing and Heating Supply Company on specified orders. Mr. Stevens categorically denied any responsibility for obligation for this money.

"(E) That Republic Water Heater Company would refund to Consumers Plumbing and Heating Supply Company the amount of money rebated to Consumers Plumbing and Heating Supply Company's customers which sum was necessary to refund to their accounts, in order that Water Heaters already delivered could be kept on the respective customers floors, and which refund was necessary because of the degeneration of the market for Water Heaters in the Cleveland area as a direct result of the operations of Gafney-Bierman Company. Any such obligation was again denied by Mr. Stevens.

"(F) The Republic Heater Company would keep Consumers Plumbing and Heating Supply Company competitive in the future with all manufacturers selling Water Heaters in the general trading area, such as Morflow, Hotstream, Rheem, Cleveland Heater Company, Sands, White Heater Company, etc. This competitive condition was to be met immediately, and in the future at all times.

"(G) That Republic Water Heater Company would make Consumers aware of all advertising assistance available, such as post cards, service labels, catalogues, ad mats, etc.

"(H) That Republic Water Heater Company would extend the price protection date of all orders placed with Republic Water Heater Company by Consumers Plumbing and Heating Supply Company from December 31, 1958, by the number of days from October 31, 1958 (the date of the last stock shipment received) till the date of a letter from Republic

stating compliance with requests outlined by Mr. Friedman.

"(I) That Republic would offer continued service, usually prompt delivery, attendance to defective materials, local service, etc., as was necessary for continued satisfactory operation.

"(J) That Republic Heater Company and Consumers Plumbing and Heating Supply Company would have had their last misunderstanding, and that Consumers would be given the consideration due them as an outstanding distributor for Republic Water Heater Company."

Three days after the conversation with Stevens, on December 9th, plaintiff shipped the heaters which are the subject of plaintiff's claim 15 (Plaintiff's Exhibit H).

On December 10, a balance was due on the account and on December 12 defendant purported to pay it, except that defendant held back $7,000 which was to be paid "when instructed by R. C. Friedman."

Then, on December 19th, plaintiff's vice president and general manager, William Lennon, wrote in a letter to Friedman, the following:

"This company is ready, willing and able to fulfill its legal obligations. Shipment of water heaters can be made under our terms and conditions of sale. We have certain orders from your company on file specifying quantities, model numbers, prices and job names, along with dates of completion. We are prepared to live up to the obligations of these orders.

". . . The explanation given for the $7,000.00 deduction is contrary to our conditions of sale. You stated that you are holding the $7,000.00 payment for heaters shipped during the month of November to insure our shipping you at least $7,000.00 worth of heaters in the future. . . .

"In light of your past record of arbitrary deductions, 'misunderstanding of terms,' arbitrary withholding of $7,000.00 and your violation of our selling agreement, and in keeping with our desire to improve our channels of distribution, we are hereby notifying you that we are unwilling to ship to your account for any and all of your four locations.

"Unless payment for your account in full is received in this office by December 23, 1958, we will be forced to take necessary legal action to insure collection."

Friedman's letter of December 22, containing the conditions of doing business, *supra*, also acknowledged receipt of the above letter from Lennon and stated Defendant was proceeding to buy on the open market the heaters ordered from, but not delivered by, plaintiff.

Within a few days, defendant made arrangements with Morflo Industries, Inc., for the purchase of at least $75,000 worth of heaters in the following year. Morflo guaranteed prices would not be increased during that period.

Plaintiff brought this action on its account with defendant for heaters sold, freight and parcel post, and prayed for a judgment of $7,465.58 and interest.

Defendant filed a general denial to the petition and a cross-petition alleging defendant, to fulfill commitments to its customers, had to purchase heaters on the market at prices higher than those to which plaintiff had bound itself. The difference in prices was alleged to be $10,646.82, and defendant prayed for judgment in that amount, with interest.

At the trial, plaintiff produced evidence of an additional item on the account of $470.45 (Plaintiff's Exhibit H). In order to settle all matters in dispute between the parties, plaintiff was given leave during trial to amend the petition to include this item, such amendment not changing the claim substantially. Section 2309.58, Revised Code. Two small freight charges (Plaintiff's Exhibits C and E) were disputed, but the evidence showed defendant had accepted these shipments and impliedly had accepted the stated charges. Otherwise, defendant did not seriously contest the items on plaintiff's account, and the Court finds defendant owes plaintiff $7,465.58 and interest from January 10, 1959, on the petition.

The real controversy in this case is over the claims of defendant's cross-petition.

On one of the orders, plaintiff made a partial shipment on November 5th for which payment was due on December 10th (Item 8 in the account attached to the petition). This was the payment from which $7000 was withheld. Defendant is not entitled to damages because this order was not completely filled. The pertinent section of the Sales Act then in force, Section 1315.46, Revised Code, provides as follows:

"Unless otherwise agreed, the buyer of goods is not bound to accept delivery thereof by installments.

"When there is a contract to sell goods to be delivered by stated installments, which are to be separately paid for, and the seller makes defective deliveries in respect to one or more installments, or the buyer neglects or refuses to take delivery of or pay for one or more installments, it depends in each case on the terms of the contract and the circumstances of the case, whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for compensation but not to a right to treat the whole contract as broken."

The failure to pay the substantial amount due on this order, following on the heels of the troubled relations of the parties and the unprecedented demands of the defendant put forth as conditions for doing business in the future, is a material breach of contract within the purview of the statute. Plaintiff was justified in repudiating this order.

In *The Bell Garment Co.* v. *The Unity Silk Co.* (1911), 18 O. C. C. (N. S.), 468, 33 O. C. D., 165, affirmed without opinion in 88 Ohio St., 578, 105 N. E., 767, the syllabus is as follows:

"A garment company being indebted to a silk company for silk furnished it, agreed to pay its bills when due, if the silk company would furnish it further silk, 'up to twenty-five pieces, as many as you can at once.' Accordingly the silk company shipped two more pieces of silk but the garment company, instead of paying its bills then due, sent on a check for only part of the amount keeping out a certain sum, as it claimed, 'for the purpose of protecting it and guaranteeing that the silk company would perform its contract in the future.' *Held*: By so doing the garment company gave good excuse to the silk company to terminate the contract."

Plaintiff was also justified in repudiating the other unfilled orders of defendant. Section 1315.66, Revised Code, then in effect, provides:

"When the goods have not been delivered to the buyer, and the buyer has repudiated the contract to sell or sale, or has manifested his inability to perform his obligations thereunder,

or has committed a material breach thereof, the seller may totally rescind the contract or the sale by giving notice of his election to do so to the buyer.''

The evidence does not show that Friedman's demands and conditions for doing business in the future were accepted by plaintiff, nor that they were justified. Together with the holding back of the $7,000 they indicated a reasonable probability that defendant would not make the payments for which it would be liable in the future.

4 Corbin on Contracts, Sec. 973, provides:

''If one party to a contract either willfully or by mistake demands of the other a performance to which he has no right under the contract and states definitely that unless his demand is complied with he will not render his promised performance, an anticipatory breach has been committed.''

Defendant's actions were a material breach of the contracts excusing plaintiff from shipping any more heaters.

To support its cross-petition, defendant relies primarily on *Huntington & Finke Co.* v. *The Lake Erie Lumber & Supply Co.* (1924), 109 Ohio St., 488, 143 N. E., 132.

The law of a Supreme Court case is to be found in its syllabus. *The Williamson Heater Co.* v. *Radich et al* (1934), 128 Ohio St., 124, 190 N. E., 403, 1st syllabus. Syllabus No. 1 of the *Huntington case* is as follows:

''Whether a contract of sale is entire or divisible depends generally upon the intention of the parties, and this must be ascertained by the ordinary rules of construction, considering not only the language of the contract, but also, in cases of uncertainty, the subject-matter, the situation of the parties, and circumstances surrounding the transaction, and the construction placed upon the contract by the parties themselves. If the part to be performed by one party consists of several distinct and separate items, and the price is apportioned to each item, payable at the time of delivery, the contract will generally be held severable.''

This syllabus has no relevance to the case at bar. Under the old Sales Act a divisible contract to sell was one ''in which by its terms the price for a portion of the goods sold less than the whole is fixed or ascertainable by computation.'' Section

1315.01 (E), Revised Code. A divisible contract "differs in one respect only from other contracts—namely, that on performance on one side of each of its successive divisions the other party becomes indebted for the agreed price of the division." Williston on Contracts (rev. ed.), Sec. 861. The case at bar is concerned, not with a divisible contract, but with what clearly are separate orders or contracts.

Defendant claims that the facts of the *Huntington case* are on all fours with the case at bar. In the earlier case, however, the purchaser made payments for the partial deliveries when due. 109 Ohio St. at 492, 497 and 498. It was the *seller* who breached the contracts by failing to complete the deliveries. Later, the purchaser placed additional orders, received delivery and held back payment in order to recoup its damages on the earlier contracts. The opposite situation prevails in the case at bar. Here the *purchaser* breached the contracts first and the seller refused to complete deliveries.

The *Huntington case's* actual holding, which also has no relevance to the case at bar, has been stated thus in an annotation, 75 A. L. R., 609 at 618:

"The withholding of the amount due for installments of goods delivered is justified where it was for the purpose of offsetting his damages due to existing defaults of the seller, and hence it affords no justification for his refusal to ship further installments." (*Huntington case* cited.)

Language in the *Huntington* opinion to the effect that breach of one of a series of contracts by the purchaser will not justify repudiation of the other contracts by the seller is thus obiter dicta and not binding upon this Court.

Judge David Ralph Hertz of this Court declared in *State ex Squire,* v. *Central United National Bank* (1935), 20 Ohio Law Abs., 238 at pages 243 and 244:

". . . A court has power to declare the law of the case upon the issues submitted; it has no legislative power to announce general rules of law. Nor are its syllabi invested with that legal sanctity which would require that we give statutory force to every word or expression they may contain. The exactions of stare decisis include no servitude so abject."

Only five judges of the Supreme Court of Ohio participated

in the *Huntington case*. Day, J., wrote the opinion of the court. Wanamaker, J., neither concurred nor dissented. The other three, Matthias, Allen and Robinson, JJ., joined only in the conclusion that the judgments of the lower courts should be affirmed. Judge Robinson further noted that the trial court had found as a matter of fact "that the plaintiff (seller) breached the contracts" and the Court of Appeals found that "substantial justice" had been done. 109 Ohio St at 502. Thus, the language of the opinion upon which defendant in the case at bar relies is the obiter pronouncement of its author alone.

The *Huntington case* has been cited as precedent in only five cases, all of them in lower courts. In *Universal Coal Co* v. *Old Ben Coal Corp.* (1929), 32 Ohio App., 254, 260; 167 N. E., 904, it was listed as authority for the same proposition, inapplicable here, as the quotation from 75 A. L. R., 618, *supra*. In *Holland Furnace Co.* v. *Joy* (1934), 16 Ohio Law Abs., 251, 254; *Gibbons* v. *Schwind Realty Co.* (1937), 25 Ohio Law Abs., 260, 263; *Lawyers Cooperative Publishing Co.* v. *Rose* (1937), 25 Ohio Law Abs., 572, 575; and *Seybold* v. *Pitz* (1955), 101 Ohio App., 316, 322, 136 N. E. (2d), 666, the proposition of the syllabus, *supra*, likewise of no concern here, was discussed.

Defendant's position, for which it cites the *Huntington case*, is dubious. To state it in its simplest terms: If there is one installment contract between seller and buyer and one party breaches it under circumstances indicating he will not perform his duties in the future, then the other party is excused from further performance. However, if there are two contracts between the parties, then the injured party must go ahead under the second contract until it too is breached, even though the risk is the same as under the first contract.

The Uniform Commercial Code, which went into effect in 1962, recognizes that a party to an installment contract has a right to "a continuing sense of reliance and security that the promised performance will be forthcoming when due;" the Code makes provision for an adequate assurance of performance. Section 1302.67, Revised Code, and Committee Comments 1 and 4, citing *Corn Products Refining Co.* v. *Fasola* (1920), 94 N. J. L., 181, 109 A., 505.

The questionable obiter dicta of the *Huntington case*, therefore, should be disregarded.

As to the issue of damages, defendant has not sustained the burden of proof. The measure of damages is set forth in Section 1315.68, Revised Code:

". . . .

"When there is an available market for the goods in question, the measure of damages . . . is the difference between the contract price and the market or current price of the goods at the time when they ought to have been delivered, or, if no time was fixed, then at the time of the refusal to deliver."

Delivery of the heaters was to be by installments in amounts and at times requested by defendant. Within less than a week after receiving Lennon's letter of December 19, *supra*, Friedman had received a commitment from Morflo as to prices and supplying his needs. Defendant's Exhibit 13 is a comparison of plaintiff's prices for the heaters in question and Morflo's list prices on January 10, 1959. Defendant on that date had not yet asked for delivery of the heaters. Purchases from Morflo were made later in the year from time to time. Defendant's other evidence on damages consisted of purchase orders to Morflo and checks of defendant Morflo, totalling $75,000. There was no showing of what defendant actually paid to Morflo for heaters equivalent to those ordered from plaintiff but not delivered.

Since the evidence did not show defendant was in position to take all the heaters when relations with plaintiff were broken off and Morflo was soon available as a supplier and eager to sell, any damages should be measured by the actual amount paid for heaters from the new source. Defendant has not met the standard of proof set forth in Section 1315.68, Revised Code, *supra*.

The heater business has been one of intense competition between standardized models, starting years before the dispute between the parties and continuing to the present day. Prices have steadily declined over the period. Suppliers issue price lists periodically, but during the times in question the customers were customarily granted discounts on list prices. It is doubtful that defendant paid Morflo substantially greater prices for the heaters it had ordered but not bought from plaintiff.

Judgment shall be awarded to plaintiff against defendant

on the petition for $7,465.58 with interest at six per cent (6%) per annum from January 10, 1959, and to plaintiff against defendant on the cross-petition. Counsel for plaintiff are requested to prepare and submit, in accordance with court rules, a judgment entry, which shall also contain an appropriate provision allowing the petition to be amended to include the $470.45 item set forth in Plaintiff's Exhibit H.