**NEW YORK CENTRAL RAILROAD COMPANY, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**Civ. No. 34518.**

United States District Court
N. D. Ohio, E. D.
March 18, 1960.

As Corrected April 6, 1960.

John F. Dolan and Joseph T. Ryan, Cleveland, Ohio, for plaintiff.

Burns Weston of Johnson, Weston, Blackmore, Cory & Hurd, Cleveland, Ohio, for defendant.

KALBFLEISCH, District Judge.

The plaintiff in its original complaint filed May 29, 1958, in addition to the usual allegations as to corporate capacity and jurisdiction, alleges that the plaintiff and defendant entered into a sidetrack agreement on May 12, 1954; a copy of the agreement was attached, marked Exhibit A. This agreement pertained to sidetracks constructed for the servicing of the General Motors Corporation's plant, hereinafter referred to as the Clinton Road Plant or the Cleveland Diesel Engine Division, one of said sidetracks being identified as A′ B′. The plaintiff further alleges that on May 6, 1955, while said agreement was in full force and effect, an employee of the defendant, Martin J. Sendry, was injured during a switching operation being conducted by a train crew employed by the plaintiff upon tracks A′ B′. Sendry's injuries are alleged to have resulted from his being pinned between a railroad car and a locomotive underframe which had been placed upon and across the sidetrack by employees of the defendant. It is alleged that thereafter Martin J. Sendry commenced an action against the plaintiff in the Common Pleas Court of Cuyahoga County, Case No. 680939, praying for judgment against this plaintiff in the amount of $250,000 for injuries al-

legedly proximately resulting from the movement of the railroad car.

The original complaint demands, under the terms of the sidetrack agreement, that the Court declare and determine the right of the plaintiff to have the General Motors Corporation assume and indemnify and hold the plaintiff harmless from any and all liabilities, losses and expenses resulting from damages to Martin J. Sendry. The original complaint further demands that the Court declare and determine each and every, all and singular, the liabilities and duties owing to the plaintiff from the defendant, arising out of or connected with the occurrence of May 6, 1955, in which Martin J. Sendry was injured.

The Martin J. Sendry case against the plaintiff, No. 680939, was assigned and came on for trial in the Common Pleas Court on September 25, 1959, which was before the original complaint in the instant case had been submitted and decided. It is conceded by the plaintiff and the defendant that defendant's Exhibit V, a letter dated April 2, 1957, was the first notice by the plaintiff to the defendant requesting the defendant to assume complete responsibility for the Martin J. Sendry accident. The defendant declined and refused the plaintiff's request to accept the responsibility in the Martin Sendry case or to agree to reimburse the Railroad Company for the expense of defense of the Sendry action or any judgment which might be rendered therein. It appears that the next notice of the plaintiff's demands was the institution of this case by the filing of the complaint on May 29, 1958.

On December 14, 1959, the plaintiff filed its supplemental complaint alleging that the case of Martin J. Sendry v. New York Central Railroad Company, No. 680939, came on for trial, that the plaintiff paid to Martin J. Sendry the sum of $48,750 as a consideration for a settlement and compromise, and that the plaintiff expended $1,767.13 in the course of the preparation of its defense of the suit by Martin J. Sendry, including court costs; and in its supplemental complaint plaintiff demands that this Court declare and determine each and every, all and singular, the liabilities and duties owing the plaintiff from the defendant, arising out of or connected with the occurrence of May 6, 1955, in which Martin J. Sendry was injured. The plaintiff prays that it may recover $50,517.13 plus a reasonable amount for services of attorneys in connection with Case No. 680939 in the Court of Common Pleas.

Thereafter, a number of requests for admissions and interrogatories were filed and answered by each of the parties. From the admissions, the answers to the interrogatories and the evidence, the Court finds the following facts:

That The New York Central Railroad Company is a railroad organized under the laws of and is a citizen of the State of Ohio.

That the General Motors Corporation is a corporation organized under the laws of and is a citizen of the State of Delaware.

That the matter in controversy in the instant case exceeds, exclusive of interests and costs, the sum of $3,000.

That the General Motors Corporation executed an agreement with The New York Central Railroad Company on or about May 12, 1954, called "Private Sidetrack Agreement."

That on May 24, 1954, the said agreement of May 12, 1954, was modified by The New York Central Railroad Company and General Motors Corporation.

That Exhibit A appended to the complaint of The New York Central Railroad Company is a correct copy of the "Private Sidetrack Agreement" entered into by and between The New York Central Railroad Company and General Motors Corporation on May 12, 1954.

That Exhibit B appended to plaintiff's complaint is a true and correct copy of the "Private Sidetrack Agreement" entered into by and between The New York Central Railroad Company and the General Motors Corporation on or about May 24, 1954.

That said "Private Sidetrack Agreement" entered into between The New York Central Railroad Company and General Motors Corporation on or about May 12, 1954, and as modified on or about May 24, 1954, was in full force and effect on May 6, 1955.

That Exhibit B attached to plaintiff's complaint is a true and correct copy of a map attached to the said "Private Sidetrack Agreement" entered into by and between The New York Central Railroad Company and the General Motors Corporation on or about May 12, 1954, and modified on or about May 24, 1954.

That said map marked Exhibit B attached to plaintiff's complaint shows the layout and location of tracks in the vicinity of the General Motors plant and facilities in the vicinity of Clinton Road and The New York Central right of way in the Village of Brooklyn, County of Cuyahoga, State of Ohio.

That the track marked in solid yellow and dashed yellow on Exhibit B attached to plaintiff's complaint is owned and maintained by the General Motors Corporation.

That Martin J. Sendry, on May 6, 1955, was pinned between the coupler of a railroad car and an underframe which rested on the track marked A' B' on Exhibit B attached to plaintiff's complaint.

That for approximately six years prior to the execution of the agreement of May 12, 1954, the General Motors Corporation, by its Electromotive Division and its Cleveland Diesel Division, used the premises at the Clinton Road Plant for the production of diesel locomotives and appurtenances including diesel engines.

That during such period Track A' B' was used primarily for the assembly of diesel locomotives which were moved westerly along said track.

That the assembly of diesel locomotives was shut down by the General Motors Corporation in 1954.

That the General Motors Corporation continued the manufacture of diesel locomotive underframes at the Clinton Road plant until some time in 1956.

That such locomotive underframes were manufactured in the easterly portion of Bay 12 in which Track A' B' is located.

That during part of 1954, 1955 and 1956, sub-assembly of underframe parts was carried on in Bay 12 in the most easterly portion thereof, and that Track A' B' was located in the easterly portion of said bay and extended 458 feet to the westerly end of the building.

That just west of the sub-assembly area, final assembly of underframes was made upon Track A' B' and on both sides thereof in Bay 12.

That just west of the final assembly area, painting of the underframes was done upon Track A' B' and on both sides thereof in Bay 12.

That just to the west of the painting area, completed underframes were stored on Track A' B' and on both sides thereof in Bay 12 prior to their being loaded aboard the railroad's gondola cars for shipment out of the city.

That just to the west of the storage area, completed underframes were loaded aboard the railroad's gondola cars which were spotted on Track A' B'.

That such manufacturing activities as were conducted in Bay 12, underframe assembly and shipment, transpired from sometime in 1954 to 1956.

That certain train crew members, employees of The New York Central Railroad, entered the General Motors premises at Clinton Road for the purpose of picking up or making delivery of railroad cars, observed activities in and about Bay 12 which appeared to be the manufacture and shipment of locomotive underframes.

That certain train crew members, employees of The New York Central Railroad, observed the manufacture of diesel locomotives in Bay 12 while such operations were conducted while switching the finished locomotives which were delivered to The New York Central Railroad for shipment.

That prior to the accident on May 6, 1955, in which Martin J. Sendry was injured, The New York Central Railroad

gave no written notice to General Motors Corporation that the use of the easterly portion of Bay 12, including the easterly portion of Track A' B', constituted the creation or maintenance of an obstruction, within the meaning of the fifth paragraph of the sidetrack agreement of May 12, 1954.

That prior to the accident of Martin J. Sendry on May 6, 1955, no written complaint or objection was made by The New York Central to the use that the General Motors Corporation made of Bay 12 at the Clinton Road plant, its private property.

That prior to the accident of Martin J. Sendry on May 6, 1955, The New York Central Railroad gave no oral notice to General Motors complaining that the use of Bay 12 at the Clinton Road Plant, the private property of General Motors, constituted an obstruction within the meaning of Paragraph Fifth of the agreement of May 12, 1954.

That prior to the accident of Martin J. Sendry on May 6, 1955, The New York Central gave no oral notice to General Motors complaining of its use of Bay 12 at the Clinton Road Plant.

That The New York Central Railroad Company, a common carrier engaged in intrastate and interstate commerce, by rail, and having the duty to serve the General Motors Corporation as a common carrier, has never refused to render said service at the Clinton Road Plant and has never invoked Paragraph Second (e) of the May 12, 1954 agreement.

That the operating officers of The New York Central Railroad Company gave no notice to the General Motors Corporation prior to the accident of Martin J. Sendry on May 6, 1955, that the use of Track A' B' in Bay 12 of the Clinton Road Plant for the manufacture of underframes was an obstruction within the meaning of the sidetrack agreement.

That the conductors and brakemen, as members of the train crews and employees of the plaintiff, in the course of switching operations on Track A' B' in the Clinton Road Plant of the defendant, observed and were aware of the manufacturing procedures of the defendant over, upon and adjacent to Track A' B' including the placing of underframes before loading upon Track A' B' at approximately column 10–C, at the point where the underframe was resting at the time of the Sendry accident, and such observations and knowledge of the train crew members began in November or December of 1954 and continued until May 6, 1955, the date of the Sendry accident; however, the train crew members did not communicate or report such observations and knowledge to any operating officers of The New York Central Railroad Company having supervisory or executive authority.

That Martin J. Sendry commenced an action against The New York Central Railroad Company in the Common Pleas Court of Cuyahoga County, No. 680939, praying for judgment against The New York Central Railroad Company in the amount of $250,000 for injuries allegedly received and proximately resulting from the movement of a railroad car which pinned Mr. Sendry between its coupler and an underframe resting on track marked A' B' on Exhibit B attached to plaintiff's complaint.

That The New York Central Railroad Company by its attorneys has in writing demanded that the General Motors Corporation assume the defense of the action commenced by Martin J. Sendry against The New York Central Railroad Company and that General Motors Corporation hold The New York Central Railroad Company harmless from all costs and expenses connected therewith pursuant to the provisions of Exhibit A attached to plaintiff's complaint.

That the General Motors Corporation has refused to assume the defense of and indemnify The New York Central Railroad Company from any and all liabilities, losses and expenses resulting from damages or injury to Martin J. Sendry resulting from the occurrence of May 6, 1955.

That Martin J. Sendry at the time and place of his injury on May 6, 1955, walked across the track A′ B′ at a location where there was no yellow line walkway.

That the presence of the underframe on track A′ B′ at the time and place of Martin J. Sendry's injury is connected with his injury.

That the presence of the underframe on track A′ B′ at the time and place of Martin J. Sendry's injury is directly connected to the injury which he received on that occasion.

That on the afternoon of May 6, 1955, while a coupling operation was taking place, a car standing on track A′ B′ moved easterly on said track and pinned Martin J. Sendry against an underframe.

That the locomotive involved in the coupling operation was operated by The New York Central Railroad Company. The coupling operation and the locomotive operation were railroad movements made upon track A′ B′ by The New York Central Railroad Company at 3:30 to 3:45 P.M., May 6, 1955.

That during the course of such movements, Martin J. Sendry was pinned against an underframe standing across track A′ B′.

That at the time and place of Martin J. Sendry's injury on May 6, 1955, he was acting in the scope of his employment as an employee of the General Motors Corporation.

That the underframe against which Martin J. Sendry was pinned was placed on track A′ B′ in Bay 12 in the near vicinity of column 10–C, and extended easterly thereof covering both of the rails of the said track A′ B′.

That subsequent to the execution of the side track agreement, the General Motors Corporation has not requested from The New York Central Railroad Company a modification of said sidetrack agreement (Exhibit A) or the exhibits appended thereto, when considering changes or making changes and alterations in track clearances, track layout, removal of track or the erection of a bumper post on track A′ B′, between the date of that agreement and the date on which Martin Sendry was injured, to wit, May 6, 1955.

That John E. Hacker, General Manager of the Clinton Road Plant from November 1953 until the present time, admitted he had no knowledge of the sidetrack agreement, and none of the operating officers subordinate to Mr. Hacker had any knowledge of the sidetrack agreement prior to the Sendry accident on May 6, 1955.

That between 1954 and the date of Sendry's accident, under General Manager Hacker's direction and supervision, various changes were made in manufacturing procedures affecting Bay 12 and Track A′ B′, as shown by defendant's Exhibit U and the testimony of Carl Rowland, Layout Engineer. At the time of the execution of the contract of May 12, 1954, the floor adjacent to Track A′ B′ consisted of wooden blocks laid to a level with the top of the rail, with a sufficient space on the inside of the rail to accept the flange on the wheels of a railroad car. The changes in the layout of manufacturing procedures in Bay 12 included filling the space between the rail and the wood blocks with a tar or asphalt substance, and further included the installation of machinery for welding and other purposes, which installations occupied not only the space in between the rail but also to each side of the rail, and the manufacturing procedures ended with the placing of an underframe for loading purposes upon Track A′ B′ opposite column 10–C.

That from November or December 1954 until May 6, 1955, the date of Sendry's accident, no switching operation or movement of railroad cars extended to the east of column 10–C on Track A′ B′, for the reason that the underframe and the manufacturing equipment were of such size and weight that the track was completely blocked to the east of column 10–C.

That the General Motors Corporation had not requested from The New York

Central Railroad Company a modification of the said sidetrack agreement (Exhibit A) to show changes in the use of its property and facilities or to show any changes, alterations, new bumper posts or removal of track on the exhibits appended thereto.

That no warning signs or guards were posted at or near the underframe by employees of the General Motors Corporation on or prior to May 6, 1955.

That no application was made by General Motors Corporation to the Public Utilities Commission of Ohio with respect to that portion of Bay 12 in which Track A′ B′ was located.

That steel plates were welded to Track A′ B′ by General Motors employees within a few days after Martin Sendry's accident. These plates served the purpose of a bumper post, and they were installed in the immediate vicinity of column 10–C.

That Paul Ficzari was the safety engineer employed by the defendant since 1948 at the Clinton Road Plant, and as such interviewed and instructed the foremen on safety practices and admitted it was the policy of the defendant to require its foremen to instruct the workmen on safety practices. Under his direction and supervision, aisleways or walkways for the use of employees were marked on the floor with yellow paint, and the space between the underframe and the railroad car where Sendry was hurt was not a recognized aisleway or walkway.

That Mr. Skedel, the foreman in Bay 12, Mr. Burns, the loading foreman, Mr. Schneider, the traffic manager, and Mr. Ficzari were aware of the duties of the workmen at the location of the underframe when it was ready for loading, and were also aware that other employees used the space between the underframe and the railroad car when walking to different points in the plant. They also were aware that there were no bumper stops or other devices on Track A′ B′ to prevent the railroad car from moving against the underframe.

That it was part of the duties of the foremen and Mr. Ficzari to detect and eliminate safety hazards in the Clinton Road Plant.

That Martin J. Sendry at the time of his injury and prior thereto, with the knowledge and consent of the supervisory officers of the defendant, used the space between the underframe at the loading position and the railroad car as an aisleway or walkway in performing his duties as an employee in the Maintenance Department.

That the various changes in manufacturing procedures occurred by reason of General Motors' decision to discontinue assembling diesel locomotives at the Clinton Road Plant and to convert the plant to the production of locomotive underframes. The conversion to underframe manufacture began approximately in March 1954, two or three months before the contract here in issue was finalized. The conversion and setting up of new layouts in the Clinton Road Plant involved the loading and shipping of underframes, and in March 1954 representatives of The New York Central Railroad Company and of the Nickel Plate Railroad met with GM management at the Clinton Road Plant, observed the plant layout, and assisted in designing a type of gondola freight car which would accommodate two underframes. The representative of The New York Central Railroad Company who participated in this meeting was identified by name, but his authority or capacity as an employee of the plaintiff was not disclosed.

That the underframes came into the Clinton Road Plant in three sections, and the manufacturing procedures at the plant involved welding the three sections together so that when the underframe was ready for loading and shipping it was 52 feet long, 10 feet wide, and weighed 38,800 pounds, and the underframe when in a preloading position was placed upon the tracks up-side-down and the end flanges of the underframe extended 42 inches above the tracks. The preloading position of the underframe upon and across Track A′ B′ was determined and

ordered by Mr. Hacker, the general manager of the Clinton Road Plant.

That no specific oral or written permission was received by General Motors from a representative of The New York Central having authority to grant such permission to locate the underframe, against which Mr. Sendry was pinned, in the position in which it was located at the time of Mr. Sendry's injury.

That the underframe against which Mr. Sendry was pinned was placed in the preloading position about noon on May 6, 1955, and that the distance between the point of the accident and the door to the west, through which the tracks enter the building, is approximately 160 feet, and the distance between the point of the accident and the easterly end of the tracks, as shown on the plan attached to plaintiff's Exhibit 2, is approximately 298 feet.

That on the date of the Sendry accident Mr. Schneider, traffic manager for GM at the Clinton Road Plant, instructed the conductor in charge of the train crew by telling him which cars were to be moved or pulled, which cars were to be weighed, which cars were to be taken out, and where the other cars on hand should be spotted.

That Exhibits marked A, B and C attached to the plaintiff's complaint, and for the purposes of this trial marked plaintiff's Exhibit 2, constitute the entire agreement between The New York Central Railroad Company and the General Motors Corporation relating to Track A' B', upon which Mr. Sendry was injured on May 6, 1955.

By General Motors Corporation's answers to interrogatories Nos. 63 and 65 propounded by The New York Central Railroad Company, General Motors admits that the presence of the underframe on Track A' B' was directly connected with the injury received by Martin J. Sendry on May 6, 1955.

That on May 6, 1955, between 3:30 and 3:45 P. M., the train crew, consisting of an engineer, a fireman, two brakemen, and a conductor, after receiving instruc-

tions from Mr. Schneider, the traffic manager at the Clinton Road Plant, proceeded with their switching operation. The train consisted of a diesel switch engine, which was headed in an easterly direction on Track A' B', and hooked to the engine but forward of the engine were two empty gondola freight cars. Inside the building on Track A' B', and between the entrance door of the building and the underframe, there were one unloaded flatcar and one special gondola car loaded with two underframes. The empty flatcar and the loaded gondola car were not coupled together. The conductor in charge of the train crew, now deceased, walked to the easterly end of the loaded gondola car. One brakeman was at the doorway inside the building and one brakeman was outside the building, and the fireman and engineer were in the locomotive. Through standard railroad signals, the empty flatcar was coupled to the incoming engine and two cars, and at this time the conductor walked toward the end of the flatcar and away from the space between the easterly end of the loaded gondola and the underframe. With the conductor's back thus turned to the underframe, the train crew proceeded to couple the flatcar with the loaded gondola. When this coupling was being made, the train, including the loaded gondola, moved eastward a sufficient distance to pin Martin J. Sendry between a part of the gondola and the underframe, notwithstanding the fact that the brakes were set on the loaded gondola and a two by four had been placed across the tracks at right angles thereto and against the wheels at the easterly end of the gondola. The gondola, in this coupling operation, was moved eastward between two and four feet. Immediately preceding this coupling operation between the flatcar and the loaded gondola, Martin J. Sendry was carrying a bucket of filmite on his shoulder from a storage place to the north of the tracks, intending to deliver it to a place in the plant south of the tracks. As he was walking through the space between the loaded gondola and the underframe, the movement of the

loaded gondola occurred. Sendry had absolutely no opportunity to avoid his injury after he entered into the space between the gondola and the underframe. If Sendry was negligent, his negligence consisted of failing to detect or observe the switching operation before he entered into the danger area; and from the fact that there were no members of the train crew on the north side of the track and no signaling devices within the plant, except the ringing of the bell on the diesel engine, to warn of a train movement, the question of the negligence of Sendry was most certainly a question for a jury. Under the facts and circumstances, Martin J. Sendry was not negligent as a matter of law.

That the fact that the switching operation was conducted by the train crew without a member of the train crew's acting as a lookout on the north side of the train and at the point between the underframe and the loaded gondola, at the time of Sendry's injury, when the train crew knew there were no warning devices inside the Clinton Road Plant and that there were no bumper stops or other devices to limit the movement of the loaded gondola to the east against the underframe, presented a question of fact as to the common law negligence of the train crew.

That the plaintiff has established that it gave proper and timely notice to the defendant of the claims and demands of Martin J. Sendry, including Sendry's lawsuit against the plaintiff in the Common Pleas Court.

That the defendant, by amended answers to supplemental request for admissions Nos. 44, 45 and 46, admits as true: (44) The New York Central Railroad Company compromised and settled the claims which Martin J. Sendry made against The New York Central Railroad Company in the case of Martin J. Sendry v. The New York Central Railroad Company in the Court of Common Pleas, Cuyahoga County, Ohio, No. 680939. On September 25, 1959, The New York Central paid to Martin J. Sendry the sum of $48,750 as the consideration for such settlement and compromise of the claim. (45) The sum of $48,750 was paid by the railroad to Mr. Sendry in settlement of his claim against it and the sum so paid was not unreasonable—in view of the injuries sustained by Mr. Sendry and the substantial evidence of the railroad's negligence in causing the accident and the injuries resulting therefrom. (46) In addition to the said sum of $48,750, The New York Central Railroad Company expended $1,767.13 in the course of the preparation of the defense and costs of the suit of Martin J. Sendry v. The New York Central Railroad Company in the Court of Common Pleas, Cuyahoga County, No. 680939.

Although the defendant objects to the relevancy of the item of attorney fees and contends that such fees are not recoverable by the plaintiff in this case, the defendant joins with the plaintiff in a stipulation that the reasonable value of the attorney fees of the plaintiff in the defense of the Martin J. Sendry case is $1,500.

The issues in this case require the interpretation and construction of three paragraphs contained in the agreement of May 12, 1954, designated Exhibit A, as attached to plaintiff's complaint. The three paragraphs involved are as follows:

"First: (a) Location and Plan.

"Except where otherwise specifically indicated, the term 'track' as used herein shall mean all that track shown in solid red, solid yellow and dashed yellow colors on the plan No. C 10653–M1 dated February 3, 1954, attached hereto and made a part of this agreement, and shall include the roadbed, crossings, track scales, gates, bumping posts, bridges and other supporting structures and appurtenances used directly in connection with said track. The track shall be owned and the cost of maintaining the same shall be as follows:

"The part of said track, lettered -AB- and colored solid red on said plan, heretofore constructed, is the property of the Railroad and will be

maintained by the Railroad at its expense.

"The parts of said track, colored solid yellow and dashed yellow on said plan, including driveway crossings marked -f-, -g-, -h-, -j-, -k-, -l-, -m-, -n-, -p-, -r-, -s-, -t-, -u-, -v- and -w-, track scales marked -a'- and -b'-, gates marked -a-, -b-, -c-, -d-, -e- and -x-, and bumping posts at points -L-, -N'-, -S'- and -T'- on said plan, heretofore constructed, are the property of the Industry and will be maintained by the Industry at its expense.

"(b) Definition of 'Cost'.

"The term 'cost' as used herein in respect of labor, material and supervision of labor, or either, shall be inclusive of unemployment, retirement and other payroll taxes, and the Railroad's current percentage charge to cover the expense of superintendence, supervision and use of tools, handling and storing of material, workmen's compensation, liability insurance and accounting.

"Fifth: Clearances.

"The Industry shall keep said track clear of obstructions, and shall not place or allow any temporary or permanent structures or obstructions of any kind within the space of eight (8) feet on either side of the center line of said track, or within the space of twenty-two (22) feet above the said track (being the standard clearance for structures of the Railroad), except as to the clearance, if any, less than standard shown upon said plan; provided, however, that no wire or cable line of any kind shall be placed or allowed within such further space on either side or above the said track as shall be determined by the Railroad in each particular case.

"All clearances less than standard shown on said plan shall be protected by standard warning guards or signs, together with necessary lighting, placed in a manner and located satisfactory to the duly authorized representative of the Railroad. The warning guards and signs and lighting, if any, protecting the existing clearances that are less than standard, as shown on said plan, are satisfactory to the Railroad. The expense of installing and maintaining such guards or signs shall be borne by the Industry. If the structures or obstructions at said points are changed or removed, the clearance at said points shall then be made not less than standard; provided, that if situations arise in the future requiring substandard clearances, such substandard clearances may be allowed upon consent of the Railroad, and, if required, upon the approval of proper Governmental authority.

"The Industry shall assume and indemnify and hold harmless the Railroad for and from any and all liability, loss and expense, resulting from loss of life or damage or injury to persons or property (including employees of either of the parties hereto), directly connected with the presence or maintenance of structures or obstructions encroaching upon the aforesaid standard clearances or from the presence of wire or cable lines over or adjacent to said track other than structures or obstructions, wire or cable lines, belonging to the Railroad or its licensees.

"Seventh: Liability.

"It is understood that the movement of railroad locomotives involves some risk of fire, and Industry assumes all responsibility for and will indemnify Railroad against loss or damage to property of Industry or to property upon its premises (other than rolling stock of the Railroad or others, shipments in course of transportation and property of Railroad) arising from fire caused by locomotives operated by Railroad on the track or in its vicinity for the purpose of serving Industry, except that Railroad assumes all responsibility for loss or damage so caused when

proven by Industry to be due to negligence of Railroad.

"Except as herein otherwise specifically provided, in respect of all loss of or damage to property, or in respect of injury to or death of persons caused by or in connection with the construction, operation, maintenance, use, presence or removal of said track (a) the Railroad shall assume responsibility for and hold the Industry harmless from all losses, damages, claims and judgments arising from or growing out of the sole actionable acts or omissions including negligence of the Railroad, its agents or employees; (b) the parties hereto shall equally bear all losses, damages, claims and judgments arising from or growing out of the joint or concurring actionable acts or omissions including negligence of both parties hereto, their respective agents or employees; and (c) the Industry shall assume the responsibility for and save the Railroad harmless from all losses, damages, claims and judgments arising from or growing out of the sole actionable acts or omissions including negligence of the Industry, its agents or employees."

Conclusions of Law

The nature and variety of issues arising from the pleadings and the evidence appeared to me to require the voluminous, specific findings of fact as set forth above, in order that the Court may fully dispose of the issues argued and briefed by counsel, as well as any other issue that may be presented.

The first issue, briefly stated, is, What law governs? Upon this issue the defendant says:

"Plaintiff's action is founded upon a contract executed and to be performed in Ohio. It follows that plaintiff's right to recover for breach of the contract is to be determined by Ohio law."

The plaintiff, at page 11 of its trial brief, says:

"The agreement designated Exhibit A, made between The New York Central Railroad Company and General Motors Corporation on the 12th day of May, 1954, was executed in Ohio, to be performed in Ohio."

Later, plaintiff, in its brief replying to defendant's brief, said:

"General Motors has contended without evidence that the sidetrack agreement was executed in Ohio."

An examination of defendant's Exhibits B through O and plaintiff's Exhibits 20 through 22 clearly established that the contract was made and executed in Ohio and that the contract was to be performed in Ohio.

■ Therefore, it is my conclusion that the law of Ohio governs the nature, validity, obligation, interpretation and effect of this contract, as well as the remedy thereon and all matters of procedure relating thereto.

■ Having thus disposed of the issue as to the law that governs, the issue next in order is the interpretation and construction of the terms and provisions of the contract here in dispute. In dealing with this issue, certain basic and fundamental rules must be borne in mind. First, with regard to the meaning to be given to words, I believe the Ohio law applicable thereto is well stated in the case of Gibbons v. Schwind Realty Co., 25 Ohio Law Abst., 260, 262, as follows:

"In construing certain instruments, the primary rule is that the intent or purpose shall be gathered chiefly from the language employed by the parties, and where there is no doubt as to the effect to be given to the language used, there is no right of construction."

In the case of Krueger v. Schoenling Brewing Co., 82 Ohio App., 57, 79 N.E. 2d 366, the Court says:

"Where a contract is plain and unambiguous, it does not become

ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto and a corresponding advantage to the other."

See also Roosevelt Materials Company v. Nolan Brothers, Inc., 10 Cir., 1959, 264 F.2d 807, 809; Liberty National Bank & Trust Co. v. Bank of America Nat. Trust & Savings Ass'n, 10 Cir., 1955, 218 F.2d 831, 840.

The greatest latitude should be given in developing the surrounding situations and conditions attending the negotiations for the consummation of a contract, and the language employed in a contract should be construed in the light of circumstances surrounding the contracting parties at the time. Circumstantial evidence is as competent to prove a contract as it is to prove a crime.

The inescapable conclusion to be drawn from the correspondence between the executives of each party and their respective counsel of experience and skill (Defendant's Exhibits B through O, and plaintiff's Exhibits 20 through 22) is that the finalized agreement (Plaintiff's Exhibit 2) was thoroughly and completely understood with regard to the language used, as well as the full force and effect of such language as it applied to each party's rights, duties and liabilities. This contract certainly is not the end product of careless or second-class preparation. Each of the parties was concerned with and expressed the desire to formulate a contract which would be used as a standard for other contracts between the same parties, having to do with different plants belonging to the defendant, as also a contract which would be uniform and used as a standard by each of the parties in their dealings with third persons. In formulating the contract, we observe that counsel were careful to consider the Workmen's Compensation Act of Ohio (Last paragraph, page 5 of plaintiff's Exhibit 20), and it is proper to infer that the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., as it applied to the plaintiff, was also considered, and such inference clearly arises from the expressions of the attorneys in their correspondence heretofore referred to. Attention is called to the Workmen's Compensation Act of Ohio, and particularly to R.C. § 4123.74 which, in substance, provides that an employer shall not be liable to respond in damages for any injury to any employee during the employer's compliance with R.C. § 4123.35. Thus, we see the reason why Martin J. Sendry instituted the action in the Common Pleas Court of Cuyahoga County, No. 680939, against this plaintiff alone.

Returning to the subject of the interpretation and construction of the language used in the contract, we are confronted with the contention of the defendant that Track A' B' ended at a point approximately opposite column 10–C (as shown on defendant's Exhibit A and plaintiff's Exhibit 7) as a consequence of the defendant's placing underframes at that location and by reason of the manufacturing operations conducted by the defendant to the east of the underframes upon and adjacent to Track A' B'. Defendant's counsel strongly urge that this combination of activities on the part of the defendant completely blocked the use of Track A' B' to any train movement east of the underframe and, to all intents and purposes, caused the track to end 298 feet east of the actual end of the track as shown on the plan marked Exhibit B, attached to plaintiff's Exhibit 2. It is the theory of counsel for the defendant that the complete blocking of Track A' B' is not a violation of the terms of the contract. It is their view that the term "temporary or permanent structures or obstructions," as used in the Fifth Paragraph of the contract, applies only to such objects as would only partially encroach within the "standard clearances" at a place where the parties contemplated and intended that trains would be moved past said objects. To sustain their view, they cite the following cases:

"See Suwannee Valley Elec. Co-op. v. Live Oak Perry & Gulf Railroad Company, 73 So.2d 820 (Fla.Sup.Ct., 1954) (low overhead power line);

John P. Gorman Coal Company v. Louisville and Nashville Railroad Company, 213 Ky. 551, 281 S.W. 487 (1926) (pushcar); Buckeye Cotton Oil Company v. Louisville and Nashville Railroad Company, 24 F.2d 347 (6th Cir., 1928) (scaffold support); Deep Vein Coal Company v. Chicago & Eastern Illinois Railway Company, 71 F.2d 963 (7th Cir., 1934) (pole); Watkins v. Baltimore & Ohio Railroad Company, 29 F.Supp. 700 (D.C.Pa., 1939) (coal conveyor); Terminal Railroad Association of St. Louis v. Ralston Purina Company, 352 Mo. 1013, 180 S.W.2d [693] (1944) (wall of tunnel); Booth-Kelly Lumber Company v. Southern Pacific Company, 183 F.2d 902 [20 A.L.R.2d 695] (9th Cir., 1950) (cart); Minneapolis-Moline Company v. Chicago, Milwaukee, St. Paul & Pacific Railroad Company, 199 F.2d 725 (8th Cir., 1952) (trash box); Illinois Central Railroad Company v. Blaha, 3 Wis.2d 638, 89 N.W.2d 197 (1958) (side of loading dock); Ruddy v. New York Central Railroad Company, 124 F. Supp. 470 (D.C.N.Y., 1954), reversed, 224 F.2d 96 (2d Cir., 1955) (corner of building); and Gollick v. New York Central Railroad Company, 138 F.Supp. 384 (D.C.Mich., 1956) (I beam)."

Upon this issue of the case, plaintiff's counsel rely upon many of the authorities cited by defendant's counsel to sustain the view of counsel for plaintiff that the underframe against which Sendry was injured was an obstruction as that term is used in the Fifth Paragraph of the contract. Webster's New International Dictionary defines "obstruction" as follows:

"Act of obstructing or state of being obstructed; a thing that obstructs or impedes; an obstacle, impediment, or hindrance, as in a street, river, or design. ('Obstruct' is defined, 'to block up; to stop or close, as a way; to place an obstacle in, or fill with obstacles or impediments to passing; to be, or come, in the way of; to hinder from passing, action, or operation.')"

In the case of Nashville & C. R. Co. v. Carroll, 53 Tenn. 347, 368, the Court said:

"The term 'obstruction' as used by railroad men, means that which may obstruct or hinder the free and safe passage of a train, or that which may receive an injury or damage such as would be unlawful to inflict if run over or against by the train."

In 20 Words and Phrases, Perm. Ed., p. 302, it is said:

" 'Impede' is not synonymous with 'obstruct.' An obstacle, which renders access to an enclosure inconvenient, impedes the entrance thereto, but does not obstruct it, if sufficient room be left to pass in and out. 'Obstruct' means 'to prevent, to close up.' Keeler v. Green, 21 N.J.Eq. (6 C. E. Green) 27, 30."

Webster's New International Dictionary defines "structure" as follows:

"Something constructed or built, as a building, a dam, a bridge; esp., a building of some size; an edifice."

The present length of this opinion justifies my condensing the reference to other authorities I studied and considered in arriving at my conclusion as to the interpretation of the term "temporary or permanent structures or obstructions." I, therefore, refer counsel to 83 C.J.S. pages 547 through 550, and to 67 C.J.S. pages 69 and 70.

It is my conclusion that the parties, by the use of the term "temporary or permanent structures or obstructions," intended that it be interpreted and construed in its broad sense, and therefore the underframe against which Martin J. Sendry was pinned and injured on May 6, 1955, was an obstruction within the meaning of Paragraph Fifth of the contract.

Having decided that the underframe against which Martin J. Sendry was injured was an obstruction upon Track A' B' in violation of the contract, I am obliged to decide the next issue, to wit:

Is the plaintiff estopped from asserting that the under frame was an obstruction?

The defendant urges that thirteen established facts give rise to an equitable estoppel, and on pages 20 and 21 of defendant's brief they set forth the thirteen facts as follows:

"(1) Beginning at about column C–10 and extending east the flange slots along side the rails of the track were filled with asphalt, making it impossible for trains to use the easterly portion of the track.

"(2) Beginning at C–10 and extending east along the track for about 300 feet manufacturing operations were conducted on top of and to both sides of the track.

"(3) The last step in the manufacturing process was for underframes to be spotted at the Float Before Shipping position at C–10.

"(4) Cars were not placed or spotted east of the Float Before Shipping position.

"(5) The Float Before Shipping position at C–10 was the de facto end of the track.

"(6) The easterly portion of the track was completely withdrawn from rail service.

"(7) The railroad had full knowledge of this situation, which existed for at least three months and perhaps as long as one year prior to the Sendry accident.

"(8) It was the duty of the railroad crew men to look out for, remove, or notify General Motors to remove, track obstructions, and they commonly took appropriate action with respect to such obstructions whenever circumstances required.

"(9) It was the practice for General Motors' traffic manager to be notified by the railroad crew men of track obstructions which they could not remove by themselves.

"(10) It was the duty of General Motors' traffic manager to remove such obstructions, and he caused them to be removed whenever notice was given, or complaints were made, by the railroad's crews.

"(11) The railroad never at any time complained, suggested or represented that a floated underframe at the Float Before Shipping position was a prohibited obstruction within the meaning of the Agreement or an encroachment upon the standard clearspace required by the railroad.

"(12) In good faith, General Motors never considered its floating of underframes at C–10 to be in violation of the clearances requirements of the Agreement.

"(13) Because of the railroad's silence, and because the operation seemed on its face to be proper, General Motors refrained from taking any action which would terminate the continuing violation which the railroad now says existed."

I shall decide first whether each alleged fact was established and I shall express my conclusions in the order as the facts are set forth by the defendant:

(1) This statement of fact was established, except the evidence identified the substance used to fill the flange slots as "tarlike" and the evidence does not sustain the inference that such substance made it impossible for trains to use the track east of column C–10.

(2) This fact is established.

(3) This fact is established.

(4) This fact is established.

(5) The fact is no railroad equipment actually passed along the A′ B′ track east of column C–10 after underframes were placed on said track at column C–10.

(6) The tracks were not "withdrawn"; however, no rail service occurred east of column C–10 after underframes were placed on said tracks at column C–10.

(7) The railroad's knowledge consisted only of such observations as were made by its train crew members, and their observations were limited to facts (1) through (6). The train crew men did not report or communicate their observations to an operating official of the plaintiff.

(8) The evidence establishes that the train crew men occasionally removed articles from within the standard clearance along Track A' B' from the entrance of the track into the building to the underframe and on occasions notified defendant's traffic manager of the presence of obstructions; however, the evidence does not establish as a fact that "It was the duty of the railroad crew men to look out for, remove, or notify General Motors to remove, track obstructions."

(9) This fact is established.

(10) This fact is established.

(11) This fact is established, except it is not proper to say "never at any time." The evidence does establish a complaint following the Sendry incident.

(12) This fact is established, if by "General Motors" we refer only to its personnel at the Clinton Road Plant. The fact is no one at General Motors' Clinton Road Plant was aware of or had any knowledge of the Sidetrack Agreement.

(13) This statement is not a statement of a fact. It is true that the railroad was silent regarding the placing of the underframes and manufacturing operations on Track A' B' prior to the Sendry incident. It is also true that "the operation seemed on its face to be proper." It is not true that "General Motors refrained from taking any action which would terminate the continuing violation which the railroad now says existed." The evidence irrefutably established that the employees of General Motors at the Clinton Road Plant, prior to the Sendry incident, were not aware of any violation, they had no knowledge of the Sidetrack Agreement, and they at no time applied for or received consent of the plaintiff to install a manufacturing procedure as herein described. There is no evidence that the plaintiff or any of its employees said or did anything to induce General Motors to install its manufacturing procedures on Track A' B'.

 "Every fact essential to an estoppel must be clearly and satisfactorily proved by a preponderance of the evidence," 31 C.J.S. Estoppel § 162, pp.

457, 458; and each of five elements must be present to sustain this defense:

1. False representation or concealment of material facts by words, acts, conduct or silence, where there is a duty to speak,

2. By a person with knowledge, actual or constructive, of the true facts,

3. To a person without as great or sufficient knowledge,

4. With the intention that the misrepresentation or concealment shall be acted on by the latter person,

5. Who must so rely and act thereon, or omit to do some act, to his injury or prejudice. A change of position which will fulfill this element of estoppel must be actual, substantial and justified.

31 C.J.S. Estoppel § 67, p. 254, et seq.; 20 O.Jur.2d 498, et seq.; Gruber v. Savannah River Lumber Co., 4 Cir., 1924, 2 F.2d 418, 425; Grouf v. State National Bank, 8 Cir., 1930, 40 F.2d 2, 7; Fleming v. City of Steubenville, 7 Dist., 1931, 44 Ohio App. 121, 184 N.E. 701.

1. There was no false representation or concealment of material facts by plaintiff with respect to the placement of the underframes on the tracks by defendant's own employees.

Plaintiff's silence with respect to the placing of the underframes prior to the accident is of no significance due to plaintiff's lack of knowledge.

2. In its brief, page 21, defendant urges that plaintiff, in response to defendant's requests for admissions, stated that it considered defendant's floating of underframes to be a prohibited encroachment upon the clearspace and yet it remained silent to defendant's detriment. Admissions Nos. 20 and 21, to which defendant presumably refers, state only that the railroad "did consider that the storage of underframes and any other obstructions, * * * within eight feet of the center of said Track A' B' was contrary to the obligations of the General Motors Corporation * * *." This is not to say that plaintiff was aware of defendant's practice of storing underframes on these tracks prior to the accident, and I specifically find from

the evidence that plaintiff did not have such prior knowledge.

■ 3. Even if plaintiff should have known of the underframe storage, its duty in this respect could have been no greater than that of defendant which had more opportunity for knowledge.

"[I]t is well settled that, where both parties have the same information, or the same means for ascertaining the truth, there can be no estoppel." Commercial Inv. Trust v. Bay City Bank, 6 Cir., 1933, 62 F.2d 735, 736.

4. There having been no knowledge, misrepresentation or concealment on the part of plaintiff, there can be no intention that defendant act or rely thereon. Defendant introduced no evidence of such an intention.

5. General Motors Corporation failed to submit any evidence that its "layouts of manufacturing procedure" and the placing of underframes on Track A' B' were influenced in the slightest degree by any act, word or silence of the plaintiff.

■ There having been no knowledge, misrepresentation or concealment of material facts on the part of plaintiff, no intent by plaintiff that defendant act on any misrepresentation or concealment, and there having been no justifiable reliance by defendant upon the conduct of plaintiff, none of the essential elements of equitable estoppel exist herein. Current News Features v. Pulitzer Pub. Co., 8 Cir., 1936, 81 F.2d 288, 292, certiorari denied 304 U.S. 570, 58 S.Ct. 1040, 82 L.Ed. 1535; Souter v. State Mutual Life Assurance Co., 4 Cir., 1960, 273 F.2d 921, 926.

■ At this point it seems appropriate to discuss and decide the contention of the defendant that "the railroad consented to the storage of underframes upon the track." As the defendant's brief on the subject clearly reveals, it is difficult to separate the contention of equitable estoppel and this contention as to the railroad's consent. In the fourth paragraph on page 23 of defendant's brief I find the following sentence: "Having consented to it and allowed it (underframe storage, etc.), the railroad cannot now be heard to complain about it." In analyzing this sentence, the so-called consenting and allowing by the railroad are based upon the observations made by the plaintiff's train crewmen and the silence on the part of the plaintiff regarding the manufacturing procedures being conducted by the defendant on Track A' B'. On this point I have specifically found that the railroad had no knowledge of the manufacturing procedures of the defendant or of the defendant's placing underframes on Track A' B' at column C–10, and that the train crewmen's observations are not imputable to the plaintiff to convey notice and knowledge as contemplated in the Sidetrack Agreement.

The execution of the Sidetrack Agreement was preceded by six years of negotiations between the top executives of each party, with the assistance and advice of their respective legal departments. By a mere reading of the exhibits, which reflect the cautiousness and extent of their negotiations, it is proper to conclude that the parties fully understood and comprehended the terms and language of the Agreement and that they intended that any modification or amendment thereof would be initiated and consummated in much the same manner as was the execution of the Agreement, and under no circumstances did the parties contemplate or intend that a modification or amendment could or would be initiated or effected by a laborer, such as the train crewmen of the plaintiff or the welders and hookers employed by the defendant. Consistent with the foregoing conclusion, I further conclude that the evidence failed to establish that the plaintiff consented to the placing of underframes upon Track A' B'.

■ On April 2, 1957, the plaintiff notified the defendant of the claim of Martin J. Sendry, and the plaintiff instituted this case by the filing of its complaint on May 29, 1958. Thereafter,

the defendant, through its counsel, not only declined and refused to defend the action of Martin J. Sendry against the plaintiff, which was pending in the Common Pleas Court, but refused to assume, indemnify and hold harmless the plaintiff for and from any and all liability, loss and expense resulting from the damage and injury to Martin J. Sendry. On September 25, 1959, the Martin J. Sendry case against the plaintiff came on for trial in the Common Pleas Court and the plaintiff paid to Martin J. Sendry the sum of $48,750 as a consideration for a complete settlement and compromise of the case. The issue thus presented to the Court has been simplified by the admissions of the defendant that the settlement and compromise was a fair and reasonable price or amount to pay for Martin J. Sendry's damages. Defendant further admitted that plaintiff gave proper and timely notice to the defendant of the claim and consequent cause of action of Martin J. Sendry. The defendant strongly urges that the plaintiff, in settling and compromising the Martin J. Sendry case in the Common Pleas Court, was a volunteer because the plaintiff has failed to establish that it was legally liable to respond to the claim and cause of action of Martin J. Sendry, as defined in the case of Globe Indemnity Co. v. Schmitt, 142 Ohio St., 595, 53 N.E.2d 790. The plaintiff in the prosecution of this case has, for all intents and purposes, introduced much, if not all, of the evidence which Martin J. Sendry could or would have presented in his case against the plaintiff in the Common Pleas Court. From such evidence I have found and do now conclude that the plaintiff has established that it had a legal liability to respond to the claim of Martin J. Sendry.

The Sidetrack Agreement provides in part as follows:

"The Industry shall assume and indemnify and hold harmless the Railroad for and from any and all liability, loss and expense, resulting from loss of life or damage or injury to persons or property (including employees of either of the parties hereto), directly connected with the presence or maintenance of structures or obstructions * * *."

The Court has found and concluded that the underframe on Track A′ B′ was an obstruction in violation of the Sidetrack Agreement, and it therefore becomes the duty of the Court to interpret and construe the term "shall assume and indemnify and hold harmless":

"Assume" means to take to or upon one's self.

"Assume all responsibility for damages" means an obligation to pay or fight all claims for damages and save the indemnitee harmless. Corrigan Transit Co. v. Sanitary District of Chicago, 7 Cir., 137 F. 851, 855.

The word "assume" etymologically means to take upon one's self; and when used in law with respect to liability, the word means to become personally liable therefor by paying or otherwise discharging it. Despatch Oven Co. v. Rauenhorst, 229 Minn. 436, 40 N.W.2d 73.

"Indemnify" is defined by Webster to mean: "(1) to save harmless; to secure against future loss or damage; (2) to make up for what is past; to make good; to reimburse." By Worcester it is defined to be "(1) to secure against damage, loss, injury, or penalty; to save harmless; (2) to compensate for loss or injury; to reimburse; to remunerate." The word, then, appears to be used in two general senses: First, in the sense of giving security; and, second, in the sense of compensation for actual damage; and it is used in this second sense in a bond to indemnify one delivering goods to the obligor against legal liability by reason thereof." Weller v. Eames, 15 Minn. 461, 467 (Gil. 376, 383) 2 Am.Rep. 150.

"Indemnify against liability": The distinction between an agreement to "indemnify against liabili-

ty" and an agreement to "indemnify against loss" is that in the former a breach of contract occurs the moment liability is imposed on the party to be indemnified and a cause of action at once arises, while in the latter there is no breach of contract on which action can be maintained until obligee has sustained loss. In re National Surety Co., Sup., 29 N.Y.S.2d 1011, 1016, 1017.

"Hold harmless" means to assume all expenses incident to the defense of any claim and to fully compensate an indemnitee for all loss or expense, undiminished by the costs of defending a claim or litigation.

It is therefore my conclusion that the defendant was obliged to defend and pay the claims of Martin J. Sendry against the plaintiff.

Inasmuch as the defendant disclaimed its liability under the Sidetrack Agreement and refused to assume the defense of the Martin J. Sendry claim, and it having been shown that the plaintiff had a legal liability to respond to the claim of Martin J. Sendry, the plaintiff thereby was justified in exercising full control of the matter and in making a settlement in compromise without litigating the Martin J. Sendry claim to a jury verdict and final judgment.

The Court is mindful of the rule requiring strict construction of contracts of indemnity, as expressed in the case of Kay v. Pennsylvania Railroad Co., 156 Ohio St., 503, 103 N.E.2d 751. The rule requires that the intention to provide indemnification must be expressed in clear, unequivocal terms. The United States Court of Appeals for the Sixth Circuit on December 15, 1959, decided the case of General Accident Fire and Life Assurance Corp., Ltd. v. Smith and Oby Company. This decision is reported in 272 F.2d 581, which volume was delivered to my office on April 5, 1960. In this decision the Court thoroughly discussed and reviewed the indemnity provisions of a contract similar to the contract in issue here. Not desiring to extend this supplement beyond the

briefest comment necessary in order to refer counsel to the case, I do find that the decision supports and confirms certain findings of fact and conclusions of law appearing in my original memorandum. It is important to note that in the above case a petition for rehearing was filed and said petition for rehearing was denied by the Court of Appeals on February 20, 1960, 274 F.2d 819. In the case of National City Bank of Cleveland v. Citizens Building Co., Ohio App., 74 N.E.2d 273, 279, the Court held: "Contracts should be construed as a whole and full force and effect must be given each and every part thereof." In the case of Benes v. Hickox Building Co., Ohio App., 89 N.E.2d 315, 319, the Court said:

"In construing a written agreement in which the parties claim the words and expressions contain their true intent and meaning, and there is no claim of fraud or mistake, there should be given to each word and expression that plain and obvious meaning which the context and the whole instrument require to make each part consistent with the whole, and which will secure and carry into effect the object of the parties."

These Ohio authorities are supported by the chapter titled "General Rules of Construction" in 17 C.J.S. Contracts § 294, p. 682. The defendant has not asserted a claim of fraud or mistake in regard to the terms of the contract or as to the meaning of the words therein contained. I find nothing in the terms of the carefully prepared Agreement to warrant the conclusion that the language employed therein is ambiguous; on the contrary, the terms and language of the Agreement were cautiously negotiated and carefully selected. The evidence reveals that the parties hereto had negotiated and executed contracts involving the same or similar subject matter, on other occasions, having to do with other manufacturing plants of the defendant, as well as the Clinton Road Plant. The parties hereto were equally informed and experienced in sidetrack and switching operations by the Railroad in and upon the

property of the Industry; therefore, it is conclusively presumed that each knew the terms of the Agreement and, in accepting them, was bound by them. A contract executed by fully informed and experienced parties, assisted by learned and specially skilled counsel, can be of little service in fixing the rights and duties of the parties if one of the parties can easily escape from terms in the contract which later turn out to be unfavorable to such party.

It is my specific conclusion that the defendant, under Paragraph Fifth of the Sidetrack Agreement, is indebted to the plaintiff in the sum of $52,017.13, with interest thereon from September 25, 1959, said amount consisting of $48,750 (amount paid to Martin J. Sendry), $1,-767.13 (court costs and expenses of litigating the Martin J. Sendry claims), and $1,500 (attorneys' fees).

This memorandum constitutes Findings of Fact and Conclusions of Law pursuant to Rule 52(a), F.R.Civ.P., 28 U.S.C.A.

An order may be prepared in accordance with the foregoing.